JOSEPH WHARTON, PLAINTIFF IN ERROR, v. J. J. CHRISTIE, DEFENDANT IN ERROR.

1. If an employe, having been illegally discharged, sends in his written resignation, and the same has been accepted by his employer, a suit will not lie in his behalf on the contract of service.
2. The purpose of such resignation, if not illegal, will not destroy or impair such written contract.

On error to the Supreme Court.

For the plaintiff in error, *David J. Pancoast.*

For the defendant in error, *John W. Wescott.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.    My examination of this case has resulted in the conviction that the judgment before us should be reversed.

The facts necessary to explain the view thus taken are briefly these:

The defendant in error, Christie, was in the employment of Wharton, the plaintiff in error, and this suit is brought by the former for the wages stipulated for in the contract creating such relation, the ground of action being that he had been unlawfully discharged from the employment, and that consequently he had a right to such agreed wages.

The jury has found that the discharge in question was unjustifiable, and, of course, that fact is, at this stage of the proceedings, to be assumed.    Thus far there is no difficulty in the case.    The trouble arises from the step in the business next taken.    The testimony of Mr. Christie, the employe, himself narrates the transaction relating to his discharge, and there is no conflict in the evidence on the subject.    The record exhibits the following questions and answers, the Mr. Constable here mentioned being the duly authorized agent of the employer, the plaintiff in error:

"I told him," said Mr. Christie, "that Mr. Wharton (his employer) had forbade me from doing any office work."

"*Q.* Well, what did he say?

"*A.* Mr. Constable said if I did not make out the estimates· that he would discharge me. * * * I refused, and he· discharged me.

"*Q.* Then what followed?

"*A.* The writing out of a piece of paper, and that was· written out for protection—for me to get work elsewhere if I wanted to apply to any other of these glass men.

"*Q.* How did you happen to write out the piece of paper?·

"*A.* Well, through Mr. Constable's dictation.

"*Q.* Did he tell you to write it out?

"*A.* Yes, sir.

"*Q.* What·was it designed for?

"*A.* For me to get employment elsewhere.

"*Q.*· Explain what you have in mind about that.

"*A.* Elsewhere would be into any other establishment.

"*Q.* Well, you say to get you employment. Explain all that was said on the subject between you and Mr. Constable?·

"*A.* Well, a man going to be employed at any other works in the capacity that I had served Mr. Wharton, and being discharged, and it being known, he could not get any other employment.

"*Q.* Just tell us what occurred. What was said between you and Mr. Constable about it, as nearly as you can recollect it?

"*A.* Well, it was in words just like this: that this would' be of assistance to assist me in getting work—this discharge;. or this piece of paper—and my discharge would be kept secret and nobody would know anything about it; that is what· were the words that passed between us:"

The piece of paper here referred to was in these words, viz.:

"CAMDEN, September 14th, 1882.

"*Mr. Joseph Wharton:*

"I hereby resign my position as inside manager of glass· works, to take effect from September 8th.

"(Signed) J. J. CHRISTIE."

This writing was then delivered by Christie to Constable, and was accepted by him and retained until produced at the trial.

From this narration, which is the plaintiff's own, and was in nowise controverted, it will be observed that the legal question thus presented by these facts is, whether an employe can be permitted to set up that his contract of employment still continues to subsist after he has, in writing, voluntarily presented to his employer his written resignation, which has been accepted?

It is to be noted, that when the resignation in the present instance was executed, this was the situation, regarding it from the employe's own point of view: the contract of employment was still in force as it had in nowise been impaired or ended by the antecedent illegal discharge, and in this attitude of things he himself, by his own voluntary act, put an end to it. I say by his own voluntary act, because there is and can be no pretence that there was either fraud or duress in the transaction.

The inquiry, therefore, presses, on what ground can a resignation of this character be avoided or annulled? Why is it not utterly conclusive?

This resignation was a contract in writing between these parties, and it could not be altered by parol. The object or purpose of it was entirely legal, nay even laudible, as it was designed to enable the employe, who, at the worst, had committed but a slight offence, if he had committed any, to seek for employment elsewhere without the stigma placed upon him of having been discharged by his late master for imputed disobedience. The employe had, upon being illegally discharged, the option either to yield to it or to resist, and he chose the former of the alternatives, and evinced such election in the conclusive form of a written resignation.

It seems to me, upon the plainest principles of law, that, after such an act as this, the employe was utterly precluded from asserting in a court of law that the contract between himself and his employer still continued in existence.

On this ground the motion to non-suit, made at the trial, should have prevailed.

And this error ran into the charge of the trial judge. The jury were told, using the judicial language: "If Wharton, the employer, considered that Christie had been discharged— not that he had resigned, but considered that he had been discharged—then the fact of the existence of this paper, signed by Christie, purporting to be a resignation, does not necessarily prevent his right to recover, unless you consider that it was a resignation, or unless you consider that it was an acquiescence in his discharge."

Thus the question whether the paper, purporting to be a resignation, was such or not was left to the jury. There was no question made as to the execution of the paper; its terms were as clear as they could possibly be, so that the question whether it was a resignation or not was purely a legal one, and yet that question was to be settled by a verdict.

It seems to me that the error pervading the entire charge on this subject was this: that the validity of the resignation depended upon the ideas that were entertained by Wharton, the employer, with respect to the fact whether Christie was to be considered as a discharged man or as one who had voluntarily retired.

The evidence in this connection was this: Mr. Christie relates that a few days after his discharge by Constable, the agent, he called on his employer himself, and, referring to his discharge, he says: "I asked Mr. Wharton to give me an explanation of it. He said, 'Well, he had received my resignation.' I told him I had been discharged and gave my resignation after I was discharged, to save my resignation." He was told to call again, and Mr. Wharton then refused to reinstate him, and said "that Mr. Constable had the authority to do as he did do."

The instruction at the trial on this head thus proceeded: "But if, on the other hand, Mr. Wharton understood that Constable had discharged Christie, and if Wharton ratified that discharge, for what he conceived to be proper cause, then he

was not deceived by this paper writing, because he did not consider that the man had voluntarily retired. He considered him as a man who had been compulsory discharged. You will see the distinction between relying on the paper and relying on a discharge."

Now, I must think this was a plain error in law, because whatever Mr. Wharton thought on the subject referred to could not by any possibility have any effect whatever. At the time of this reported conversation it is undeniable that the contract between himself and Mr. Christie was at an end, either by the operation of the discharge or by that of the resignation, or of both. Doubtless Mr. Wharton thought at the time that the discharge was legal, and he in effect says so, but how did such belief or such expression of it affect in any degree whatever the resignation? Suppose he had directly said that the discharge was legal, and therefore the resignation was inefficacious, would that have cancelled the resignation? It does not seem to me that any one would claim that such would be its effect. The question can be readily tested. Let it be supposed that, upon reflection, Mr. Wharton had concluded that the discharge in question was unwarrantable and had notified Mr. Christie to return to his service under his contract, on refusal would a suit have lain? Certainly it is undeniable that to such a suit by the employe the resignation which had been accepted by the employer would have been a conclusive bar. If this be so, it necessarily follows that if the employer be barred by this instrument so must the employe be barred.

The question thus presented is of importance, for it relates to the legal efficacy of written agreements. This resignation was a written agreement; it purported to be absolute for all purposes on its face; its legal effect was to destroy the contract then existing between this employer and this employe; and yet on this trial the jury has been permitted to say that this paper does not contain the real understanding of these parties; that, contrary to the plain statement of the writing, they did

not intend to affect in any degree the relationship between themselves as employer and employe.

My conclusion is that this rule, if adopted in practice, will, in a most disastrous manner, affect the legal department to which it relates, and will greatly deprive written contracts of that impregnability to the assaults of parol evidence which it has ever been the policy of the law to impart to them.

From these considerations I am led to vote to reverse this judgment.

VAN SYCKEL J. (dissenting).    This is a suit brought by Christie, the plaintiff below, against Wharton to recover $1,500, a year's wages, less $45 earned by him elsewhere, after he was discharged from Wharton's employment.   The plaintiff recovered judgment for his full claim, and Wharton now seeks to set aside that judgment for alleged error in the trial court.

I will discuss such alleged errors as are deemed of sufficient importance to be considered.

The defendant below requested the court to charge the jury that the plaintiff's refusal to obey Constable's order to make an estimate for bottles was a legal cause for his discharge. The court refused so to charge.

Christie testified before the jury that he was under a contract with Wharton to serve as superintendent of his glass works for one year from July 1st, 1882, at a salary of $1,500 ; that he worked in that capacity until September 14th, 1882, when Constable, who represented Wharton in the office business, directed him to make out an estimate for bottles, which he declined to do, because he said that Wharton had forbidden him to do any office work.   Constable thereupon discharged Christie and at once put another in his place.

The trial judge charged the jury, that if Christie refused to do what under his employment he ought to have done, the discharge was lawful, but if what he was told to do was not within his employment, Constable had no right to discharge him.   This instruction was in all respects correct.   If the jury

credited the testimony of Christie, he (Christie) could not have obeyed the order of Constable without disobeying his principal.

Whether the plaintiff below was properly discharged was a question of fact for the jury, and in this respect there was no error in law.

The defendant's counsel also asked the trial judge to charge the jury that "plaintiff's subsequent employment in selling glass without insisting upon fulfilling his term was a bar to this action."

Christie testified on the trial that Constable discharged him absolutely on the 14th of September, and that he went the next day to Wharton and asked Wharton to reinstate him in his place; that Wharton refused to do so, saying that Constable had a right to discharge him, and that soon afterwards Wharton employed him to sell glass on commission, by which he earned $45.

Whether this is true was a question of fact for the jury, and we must accept it as true in considering whether there was any error in law.

The trial judge told the jury that they might regard the new employment of Christie as an acquiescence in his discharge, but that it did not necessarily bear that construction as a matter of law. That when a man was unlawfully discharged, his conduct in attempting to work, even for his old employer, did not necessarily commit him to acquiescing in his discharge. That the plaintiff's conduct was susceptible of either of these understandings on his part—*first*, that he recognized that he was properly discharged, or, *secondly*, that, without recognizing the propriety of it, he might still earn what he could, even from his late employer.

By these instructions the question was properly submitted to the jury under all the circumstances of the case as a question of fact, and the refusal of the court to charge otherwise constituted no error in law.

The main ground relied upon for reversal is that Christie, by a written resignation, acquiesced in his discharge.

Christie testified that after Constable had discharged him,. on the 14th day of September, he wrote out and signed the following paper, and handed it to Constable:

"CAMDEN, September 14, 1882.
"*Mr. Joseph Wharton:*

"I hereby resign my position as inside manager of glass works, to take effect from September 8th.
"J. J. CHRISTIE."

He said he wrote this at Constable's dictation, because Constable told him that if it was known that he was discharged, he could not get employment elsewhere; that his discharge would be kept secret, and this resignation would assist him in getting work in some other place.   He denies that he consented to the discharge, and says that he went the next day to Wharton and asked to be reinstated, which was refused.

The trial judge on this branch of the case charged the jury that if this resignation was Christie's voluntary act, and if he ceased to work because of the acceptance by his employer of the proposition contained in that resignation, he could not recover; but if Christie was discharged before he wrote that paper, and his failure to continue work was not due to a voluntary retirement, but to a compulsory retirement, and the paper was written by Christie at the suggestion of Wharton's agent for the mere purpose of enabling Christie to secure other employment, then it did not operate as a bar to the action.   The trial judge further charged in this behalf, that even though Christie did not intend this paper to be a resignation, but simply a device to aid himself to obtain another position, yet if Christie allowed Wharton to remain under the impression that he had voluntarily resigned by this written paper, that operated as an estoppel, and he could not recover.

These instructions presented the law as favorably for the defendant below as he was entitled to have it declared.

It was, under the evidence, a question of fact for the jury, whether the written paper was a voluntary surrender by the

plaintiff of his position, or whether, after being compelled against his will to submit to discharge, he resorted to the resignation for the purpose testified to by him, at the suggestion of defendant's agent.

The *Cumberland R. R. Co.* v. *Slack*, 45 *Md.* 161, presented the question involved in this case. The railroad company employed Slack as its general superintendent for a year, commencing January 1st, 1874, at an annual salary, payable monthly. On the 9th of April, 1874, he received the following letter from the president of the company:

"NEW YORK, April 8, 1874.
"*C. Slack, Esq., Superintendent, Mount Savage:*

"DEAR SIR—I am satisfied that the interests of this company require a reorganization of its local management by the concentration of its affairs in Allegany county under one head. Accordingly, I write by to-day's mail to the second vice president to assume charge of the railroad. Recent circumstances have confirmed the opinion above expressed. I presume you will prefer to retire by means of a resignation. It is hereby understood that the same is accepted, and you will please telegraph me of its transmission, as I have instructed the second vice president to take entire charge of the railroad immediately on receipt of my letter. Please confer with Mr. Millholland in turning over the papers in the superintendent's office.

"Yours respectfully,
"ALLEN CAMPBELL, *President.*"

Slack at once acted in accordance with the request in the letter by surrendering to the company his charge and leaving the service of the company. On the next day he addressed to the president of the company the following note:

"April 10, 1874.
"*Allen Campbell*:

"DEAR SIR—I hereby resign the position of general superintendent of the Cumberland and Pennsylvania Railroad Company, to take effect at once.

"Yours truly,      C. SLACK."

In an action of *assumpsit* brought by the railroad company against Slack to recover money alleged to be due by him to the company, he pleaded his discharge, and claimed to set off the amount due him for salary from the time he left the service of the company to the end of the year.

The opinion of the court, delivered by Chief Justice Bartol, held—

*First.* That the letter of the president of the company operated as a positive and peremptory dismissal of Slack from the service of the company.

*Second.* That the note of Slack, written the next day, could not change its character or construction or show that he voluntarily resigned, nor could it be construed as an acquiescence in his dismissal.

In the case cited the railroad company requested the trial judge to charge that the jury might find that, by the letter of April 10th, the defendant consented to and acquiesced in the request to resign his place, and if they did so find the defendant could not be allowed to set off. The trial judge refused so to charge, and on the review of the case the Chief Justice ruled that the request was rightly refused; that it presented a question of law for the court, and, under the circumstances of the case, the jury could not infer acquiescence.

In the case under review the charge of the trial judge was more favorable to the employer, as under his instructions it was left to the jury to say whether the conduct of the employe showed that he had acquiesced in his dismissal, and whether the resignation was in truth and in fact his act. Wharton could not claim to hold the resignation as a shield to himself, if it was given to Constable upon the express agreement that he should use it to save Christie from the consequences of dismissal. If Christie voluntarily tendered his resignation to Wharton, this action of course could not be maintained. But the very question before the trial court was whether Christie was chargeable with giving in such resignation to his employer. His evidence is that he lost his position, not by resignation, but by the wrongful act of his master. He was peremptorily

dismissed from service, and for the consequences of such dismissal Wharton's liability to him had become fixed. Nothing was done with the intention of discharging such liability. On the contrary, Christie expressly told Wharton that he wished to retain his position.

Constable had no right to deliver the resignation to Wharton to enable him to set it up as a bar to Christie's action. That was a clear misappropriation of the document, and to permit it, under the circumstances detailed by Christie, to be used for such a purpose does great injustice.

In this review on writ of error the testimony of Christie must be accepted as true. In the face of his testimony, that the paper was given for his own benefit to the agent, and not for Wharton's, it would, in my view, have been error in the court below to treat it as a bar to recovery. The questions arising in the case were properly submitted to the jury, and, in my opinion, the judgment below should be affirmed.

*For affirmance*—THE CHANCELLOR, KNAPP, MAGIE, VAN SYCKEL, BOGERT, BROWN.   6.

*For reversal*—THE CHIEF JUSTICE, DEPUE, REED, SCUDDER, CLEMENT, SMITH, WHITAKER.   7.