199 N.J. Super. 42 (1985)
488 A.2d 242
RYSZARD KASS, PLAINTIFF-APPELLANT,
v.
BROWN BOVERI CORPORATION, A NEW YORK CORPORATION, A/K/A BROWN BOVERI POWER DELIVERY INC., A DELAWARE CORPORATION, AND PETER GILLER, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 7, 1985.
Decided February 25, 1985.
*45 Before Judges McELROY and SHEBELL.
Bruce L. Atkins argued the cause for appellant (Contant, Contant, Schuber, Scherby & Atkins, attorneys; Andrew T. Fede, on the brief).
David M. Foley argued the cause for respondents (Borrus, Goldin & Foley, attorneys).
The opinion of the court was delivered by SHEBELL, J.A.D.
Plaintiff Ryszard Kass sued for compensatory and punitive damages arising out of an alleged breach of his employment agreement with defendant Brown Boveri Corporation. A bench trial resulted in a verdict in his favor for certain reimbursement and moneys due under a purported "novation" which the court found he entered into by mutual consent with the defendant. The trial court denied damages for breach of contract stating:
... I am satisfied that although Brown Boveri was in the position on September 3rd, if necessary, to have breached the contract, that is not what *46 happened. The parties reached a mutual accord through this innovation [sic] with the terms and new conditions.
This determination of the trial judge fails to accord with his specific findings of fact on the issue of the breach of the original contract. We conclude that the facts as well as the court's findings support a breach of the original contract by the employer.
Kass, an electrical engineer, received his education and training in Poland. He came to this country in 1974 unable to speak English and toiled as a ditch digger. He worked his way up and in 1978 obtained employment with Bechtel Power in Marquette, Michigan. Eventually he became a group supervisor with Bechtel earning $40,000 per year. While working there in 1979 he met Peter Giller of Brown Boveri Corporation and during a period of over a year they discussed the possibility of plaintiff being employed by Brown Boveri. Giller desired to have plaintiff work in a sales position but plaintiff did not want to work as a salesman; he wanted management responsibilities. In early 1981 Kass and Brown Boveri entered into a written employment agreement, the terms of which are not in dispute. Kass was to be employed as manager of Control and Automation and was to receive $40,000 per year together with an automatic bonus of $5,000 to be paid quarterly. The contract, to run for two years commencing March 1, 1981, gave either party the right to terminate without cause by giving 90 days written notice but in no event could notice be given before November 30, 1982 except by "mutual consent." It permitted termination by the employer for "cause" upon 30 days written notice, provided for prior notice to the employee of any performance deficiencies and set a time for correction of such deficiencies. The contract could only be changed by a writing signed by the party against whom the change was sought and was to be governed by New York law.
It was brought to Kass's attention that another management employee of Brown Boveri, Bruce Reinmann, had management responsibilities on a particular project that would conflict *47 with those to be accorded Kass under the contract. There was for this reason a "gentlemen's agreement" entered into, referred to as a "six-month grace period," during which Kass would not exercise his management authority over Reinmann or his project. At the expiration of this grace period, Brown Boveri attempted to reclassify plaintiff to the lesser position of sales engineer. Plaintiff ultimately submitted a letter of resignation. The trial judge found Giller's
ultimate determination, as he candidly admits, was that he could not allow, for whatever his reasons, Mr. Kass to function as the then manager of the department. He determined that, for whatever reasons he came to that judgment, Mr. Kass did not have sufficient managerial experience and in effect would not give him responsibility for Mr. Reinmann or indeed, apparently for anybody else, in that apt [sic]  so, he determined that at that point he would materially terminate that part of the contract or breach that part of the contract. [(emphasis added)]
Our review satisfies us that the proofs are clear and will only support a finding that Brown Boveri breached the employment contract.
The court went on to find that when the subject was discussed between Giller and Kass
... that Mr. Kass had, in effect, three options; to get fired, because it was, I think, made pretty clear that he was not going to be allowed to continue on as the manager and despite Brown Boveri's taking the position that they would have allowed him to just fill out the contract and remain as the manager and would have gotten fully paid for being the manager and allowed him to function, I just can't accept that that would have occurred, particularly when Mr. Giller candidly says that he had already made the determination he wasn't then manager quantity [sic], so, in effect, he had the choice of getting fired. He would have gotten paid for having been fired, but he would also have lost the title and as somebody had indicated, there is a certain stigma to getting fired.... The second option available to him was to take [the] lesser job of sales engineer. He didn't want that because he had said in the very beginning that is what he was getting out from under at Bactil [sic] and that he had discussed with Mr. Giller that he didn't want a sales job. He wanted his manager's job, so he had that opportunity of taking the lesser job as a sales engineer for relatively the same pay except that a bonus would not be guaranteed, and perhaps he hopes that someday he would be able to re-acquire the managerial position. The third option was to create an evasion of the original contract by mutual consent of the parties. I don't think it makes much difference to determine whether or not he agreed to take the sales job and then *48 changed his mind or not. I think everybody is clear that as a bottom line principle, he didn't want the sales job.
The Court then mused:
What then is the effect of what has been received into evidence as P-10? [Letter of Resignation] I have asked myself the question several times what is the significance of P-10, and I have tried to raise the question in the argument of Counsel, what does P-10 mean. What did Mr. Kass have to gain by resigning? Frankly, I have not been able to come up with any type of a satisfa[c]tory answer to that question.
The court nonetheless went on to find that a novation had taken place by the employee submitting a letter of resignation from his position as manager because
... [h]e wanted to reserve his job title and his ability to go out and solicit further employment holding himself out as a manager and having had [a] managerial position which he simply resigned.
The court found Kass fully understood what mutual consent meant when he indicated in his letter of resignation that he was terminating the employment by mutual consent. The court stated:
... I don't find any duress of somebody dictating a letter for [sic] handing it to him to sign or anything of that nature which would suggest the actual language to be used other than this concept of perhaps somebody suggested mutual consent, to which he concurred.
The court found plaintiff had something to gain from the novation in that
[o]n the record the file became listed as a resignation. He had that to gain from and I don't see that he had anything else, particularly, to gain from it.
The facts presented lead us unequivocally to the conclusion that defendant Brown Boveri breached the employment contract. There is an emerging pattern of persuasive out-of-state case law supporting the propositions that Brown Boveri's attempt to reclassify plaintiff to a lesser job status constructively discharged him in violation of his employment contract, see, e.g., Knee v. School District No. 139, In Canyon County, 106 Idaho 152, 153-55, 676 P.2d 727, 728-30 (Ct.App. 1984) (recognizing the principle that where "sufficient words or actions by the employer would lead a prudent man to believe his tenure [has] been terminated" a constructive discharge is present); Sanders v. May Broadcasting Co., 214 Neb. 755, 758-762, 336 N.W.2d *49 92, 95-96 (1983) (constructive discharge and breach of contract occur where employee contracts to fill a particular position and subsequently unjustifiably suffers "any material change in duties or significant reduction in rank"); Miller v. Winshall, 9 Mass. App. 312, 318, 400 N.E.2d 1306, 1310 (1980) ("[i]f an employee, especially an executive employee, is engaged to fill a particular position, any material reduction in rank constitutes a breach of the employment agreement and is tantamount to a discharge"); 3A A. Corbin, Contracts (1960 ed. & Supp. 1984), § 683 at 223; Annotation, "Reduction in Rank or Authority or Change of Duties as Breach of Employment Contract," 63 A.L.R.3d 539 (1975 & Supp. 1984), and his letter of resignation should be no bar to a cause of action for breach of contract. See, e.g., Beye v. Bureau of National Affairs, 59 Md. App. 642, 651, 477 A.2d 1197, 1201 (1984) ("constructive discharge occurs ... when an employer deliberately causes or allows the employee's working conditions to become `so intolerable' that the employee is forced into an involuntary resignation"), cert. den. 301 Md. 639, 484 A.2d 274 (1984); LeGalley v. Bronson Community Schools, 127 Mich. App. 482, 486, 339 N.W.2d 223, 225 (1983) (same); Continental Can Co., Inc. v. State, 297 N.W.2d 241, 251 (Minn. 1980) ("constructive discharge occurs when an employee resigns in order to escape intolerable working conditions"); Breen v. Central Iowa Power & Light Co., 207 Iowa 1161, 1166, 224 N.W. 562, 564 (1929) (whether employee was discharged or resigned is immaterial where employer attempts to alter employee's job status with markedly different position so "as to warrant the employee in considering his contract ... breached"); contra, e.g., Wilkinson v. Trust Co. of Georgia Associates, 128 Ga. App. 473, 474, 197 S.E.2d 146, 148 (1973) ("[e]ven if it is shown that the plaintiff resigned under pressure at his employer's request, this did not amount to a discharge").
We are not here confronted with a case in which the attempted reclassification was properly shown to be justified. See, e.g., Brock v. Mutual Reports, Inc., 397 A.2d 149, 151-154 (D.C. 1979) (affirming trial court's finding that employee breached *50 employment contract thereby justifying reassignment). The trial court did not find the reclassification justified by any breach by plaintiff and defendant did not purport to act pursuant to the termination for cause provision of the employment contract. Kass was never permitted to assume the full scope of managerial responsibilities he contracted for, if in fact he assumed any such responsibilities at all. In a related observation one commentator has noted that "sticking the title `supervisor' on a job where one has no employees under him does not make the job `supervisory' in fact. You cannot make a lion into a chicken by calling him one." 3A A. Corbin, supra, § 683 at 826 (Supp. 1984).
Kass was unjustifiably placed in the position of submitting to his discharge, accepting a demotion or resorting to a resignation so that he might obtain employment in the future without the stigma of discharge. We note the obtaining of new employment quickly would mitigate the damages caused by his employer's contract breach and thus would benefit both parties. Nothing in the record suggests that Kass submitted his resignation with the intention of discharging his employer from liability. Nor is there any proof that the employer's liability for breach of the contract or the release of such liability was discussed by the parties. It was obvious that Kass wanted to retain his position as manager with Brown Boveri and did not desire to resign but did so only because he was terminated through a breach of the employment contract by Brown Boveri. He submitted a written resignation only to facilitate reemployment. In these circumstances we find that it would be inequitable to permit Brown Boveri to set up that resignation as a bar to Kass' action for damages flowing from their breach of the employment contract. Cf. Evaul v. Board of Education of City of Camden, 35 N.J. 244, 249-50 (1961) (finding resignation no bar to reinstatement where its submission "was an impetuous act prompted by [an] understandably distraught condition").
*51 We are aware that our holding appears to conflict with that of Wharton v. Christie, 53 N.J.L. 607 (E. & A. 1891). The facts in Wharton were substantially identical to those before us. Christie's resignation was submitted after his wrongful discharge by his employer's agent. Id. at 607-08. Christie testified as follows concerning his letter of resignation:
Q. What was it designed for?
A. For me to get employment elsewhere.
Q. Explain what you have in mind about that.
A. Elsewhere would be into any other establishment.
Q. Well, you say to get you employment. Explain all that was said on the subject between you and Mr. Constable?
A. Well, a man going to be employed at any other works in the capacity that I had served Mr. Wharton, and being discharged, and it being known, he could not get any other employment.
Q. Just tell us what occurred. What was said between you and Mr. Constable about it, as nearly as you can recollect it?
A. Well, it was in words just like this: that this would be of assistance to assist me in getting work  this discharge, or this piece of paper  and my discharge would be kept secret and nobody would know anything about it; that is what were the words that passed between us. [Id. at 608]
The Wharton court split seven to six with the majority holding that
... [t]his resignation was a written agreement; it purported to be absolute for all purposes on its face; its legal effect was to destroy the contract then existing between this employer and this employe;.... [Id. at 611]
The trial judge in Wharton instructed the jury that
... [i]f Christie was discharged before he wrote that paper, and his failure to continue work was not due to a voluntary retirement, but to a compulsory retirement, and the paper was written by Christie at the suggestion of Wharton's agent for the mere purpose of enabling Christie to secure other employment, then it did not operate as a bar to the action. [Id. at 614 (Van Syckel, J., dissenting)]
Six dissenting justices in Wharton were in favor of sustaining the trial court's instruction. To support their position they cited the opinion of Chief Justice Bartol in Cumberland & Pennsylvania R.R. Co. v. Slack, 45 Md. 161 (1876) which held that where there was a positive and peremptory dismissal of the employee that a note of resignation suggested by the employer "cannot change its character or construction, it does *52 not show that he voluntarily resigned, nor can it be construed as acquiescing in his dismissal." Id. at 175. In Cumberland the employer had requested that the court charge the jury that they might find that by the letter of resignation defendant consented to and acquiesced in the request to resign his place, and if they did so find his claim could not be allowed. Id. at 167. The trial judge's refusal to so charge was upheld. Id. at 171, 175. The court therein held that it presented a question of law for the court and under the circumstances of the case the jury should not be allowed to consider the resignation. Id. at 171, 175.
Justice Van Syckel speaking for the six dissenting justices in Wharton stated the following:
... His evidence is that he lost his position, not by resignation, but by the wrongful act of his master. He was peremptorily dismissed from service, and for the consequences of such dismissal Wharton's liability to him had become fixed. Nothing was done with the intention of discharging such liability. On the contrary, Christie expressly told Wharton that he wished to retain his position.
Constable had no right to deliver the resignation to Wharton to enable him to set it up as a bar to Christie's action. That was a clear misappropriation of the document, and to permit it, under the circumstances detailed by Christie, to be used for such a purpose does great injustice. [53 N.J.L. at 616-17]
It would be unjust to permit Brown Boveri to discharge its liability for its clear breach of the employment contract by claiming that plaintiff voluntarily resigned. Plaintiff was improperly discharged from his position as manager in violation of the terms of the employment contract. His rights were fixed as of that time and there is no evidence that he intended to discharge his employer from liability for that breach. There is neither a written release of the employer's liability nor a demonstration that an accord and satisfaction was intended. The employer suffered no detriment. It will receive credit for what it paid plaintiff subsequent to his discharge and, as stated, the employer stood to benefit when plaintiff obtained employment elsewhere, an effort facilitated by the absence of the stigma of being discharged.
*53 In Donnelly v. United Fruit Co., 40 N.J. 61, 96-97 (1963) our Supreme Court noted the emphasis placed by the Appellate Division on the employee's written resignation. While not reaching the question of the effect of that resignation and without referring to the holding in Wharton v. Christie, the Court suggested that in such matters an inquiry should be made as to the quid pro quo sought in return for the employee's resignation and any "equitable factors of the type which moved the court in Evaul v. Board of Education of the City of Camden, 35 N.J. 244 (1961)." 40 N.J. at 96-97. The Court said such considerations suggested "the need for restraint in giving decisive force to the challenged resignation." Id. at 97. The Court stated in Evaul:
Although the record does not disclose any conduct by the school officials which amounts to duress, cf. Rubenstein v. Rubenstein, 20 N.J. 359 (1956); Gobac v. Davis, 62 N.J. Super. 148 (Law Div. 1960), we think that the peculiar circumstances of this case require the reinstatement of the appellant on equitable principles. [35 N.J. at 249]
In Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980) the Court noted:
... [T]here was a fact question whether Ortho induced Dr. Pierce to resign. Consequently, the trial judge properly denied summary judgment on the alternative ground that her resignation barred this action. That determination is not challenged on this appeal. Therefore, we do not reach the question whether resignation bars an action for wrongful discharge. See, e.g., Donnelly v. United Fruit Co., 75 N.J. Super. 383 (App.Div. 1962), aff'd 40 N.J. 61 (1963). [84 N.J. at 65]
We do not consider ourselves bound by Wharton for as stated in State v. Ciuffini, 164 N.J. Super. 145 (App.Div. 1978):
... Where more recent decisions of the Supreme Court plainly undermine the authority of a prior decision although not squarely and explicitly overruling it, we are entitled to follow the current doctrine and need not be confined by the prior ruling. See e.g.; State v. Chiarello, 69 N.J. Super. 479, 498 (App.Div. 1961), certif. den. 36 N.J. 301 (1962). [164 N.J. Super. at 152]
Wharton was decided in 1891 and reflects the attitudes of an era when employer-employee relations were vastly different than the present. The more recent New Jersey Supreme Court decisions referred to above did not seize upon the Wharton ruling as a ready means of disposing of the claims of employees *54 made after they had submitted resignations. The Court in Pierce established causes of action for at will employees discharged for refusing to perform acts that violate "a clear mandate of public policy." 84 N.J. at 72. In so doing the Pierce Court noted that:
In the last century, the common law developed in a laissez-faire climate that encouraged industrial growth and approved the right of an employer to control his own business, including the right to fire without cause an employee at will. See Comment, 26 Hastings L.J. 1434, 1441 (1975). The twentieth century has witnessed significant changes in socioeconomic values that have led to reassessment of the common law rule. Businesses have evolved from small and medium size firms to gigantic corporations in which ownership is separate from management. Formerly there was a clear delineation between employers, who frequently were owners of their own businesses, and employees. The employer in the old sense has been replaced by a superior in the corporate hierarchy who is himself an employee. We are a nation of employees. Growth in the number of employees has been accompanied by increasing recognition of the need for stability in labor relations. [84 N.J. at 66]
The Pierce Court further noted that "[i]n recognizing a cause of action to provide a remedy for employees who are wrongfully discharged, we must balance the interests of the employee, the employer, and the public." Id. at 71. In a similar vein one commentator has noted that:
We have become a nation of employees. We are dependent upon others for our means of livelihood, and most of our people have become completely dependent upon wages. If they lose their jobs they lose every resource, except for the relief supplied by the various forms of social security. Such dependence of the mass of the people upon others for all of their income is something new in the world. For our generation, the substance of life is in another man's hands. [Blades, "Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power," 67 Colum.L.Rev. 1404 (1967) (quoting F. Tannenbaum, A Philosophy of Labor 9 (1951) (emphasis in original) (footnote omitted))]
Thus, consistent with Pierce's mandate to "balance the interests of the employee, the employer, and the public," 84 N.J. at 71, we find that given the modern employee's dependence on others for all his or her income, Blades, supra, 67 Colum.L. Rev. at 1404, the employer's clear breach of the employment contract, the employer's benefit in terms of enhanced chances of mitigation and the public's interest in "the need for stability *55 in labor relations," Pierce, 84 N.J. at 66, plaintiff retains his cause of action for breach of contract.
We are confident that in the modern employment context where there is a position-specific employment contract and an employee resigns after his employer without justification forces that employee to choose from among demotion, termination or resignation, it must be concluded that the employer remains subject to liability for that breach unless facts clearly demonstrate a fairly bargained release of the employer. See also cf. Goss v. Exxon Office Systems Co., 747 F.2d 885, 887-89 (3d Cir.1984) (recognizing doctrine of constructive discharge under federal Civil Rights Act and National Labor Relations Act where employer knowingly permits working conditions to become so intolerable that a reasonable person subject to them would resign); Annotation, "Circumstances in Title VII Employment Discrimination Cases (42 USCS §§ 2000e et seq.) Which Warrant Finding of `Constructive Discharge' of Discriminatee Who Resigns Employment," 55 A.L.R.Fed. 418 (1981 & Supp. 1984).
Our conclusion that to permit plaintiff's employer to use the resignation to bar liability for its breach of contract would offend the interests of justice is also supported by the trial judge's finding that the only benefit to be derived by Kass in submitting his resignation was to avoid the stigma of the discharge by his employer. This stigma resulted from defendant's breach of the employment contract.
We emphasize that we do not intend to establish a per se rule that a resignation can never act as a bar to a breach of contract action. We simply hold that the facts here compel the finding that after the contractual breach plaintiff was deliberately placed into a coercive situation caused by unfair dealing and the unequal bargaining positions of the parties. Equitable principles require our realistic evaluation of such circumstances in order to permit shattering of the illusion of an ostensibly voluntary resignation.
*56 We have considered plaintiff's contention that he is entitled to punitive damages because defendant fraudulently induced him into the employment agreement. The trial judge dismissed plaintiff's claim for punitive damages without making specific findings of fact and conclusions of law. Nonetheless, our review satisfies us that the record will not sustain a finding that the employer intentionally induced plaintiff to enter into the employment contract with false and fraudulent representations concerning the plaintiff's management responsibilities.
The trial court found defendant had failed to prove plaintiff did not mitigate damages. We are satisfied these findings are based on competent, relevant, and reasonably credible evidence present in the record. Rova Farms Resort v. Investors Insurance Co., 65 N.J. 474, 483-84 (1974).
We reverse and remand to the trial court for entry of judgment in favor of plaintiff and for assessment of damages. We do not retain jurisdiction.