255 N.J. Super. 288 (1992)
605 A.2d 242
HELEN S. MUENCH, PLAINTIFF-APPELLANT,
v.
TOWNSHIP OF HADDON, TOWNSHIP OF HADDON POLICE DEPARTMENT, ROBERT SAUNDERS, WALTER AARON AND JOSEPH TORTORETO, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 4, 1992.
Decided March 27, 1992.
*291 Before Judges MICHELS, O'BRIEN and HAVEY.
Richard E. Yaskin argued the cause for appellant (Evans & Yaskin and Philip L. Faccenda, P.A., attorneys; Richard E. Yaskin and Philip L. Faccenda on the joint briefs).
G. Paul Crawshaw argued the cause for respondents Township of Haddon, Township of Haddon Police Department, Robert Saunders and Walter Aaron (Crawshaw & Mayfield, attorneys; William J. Thomas on the joint briefs filed by respondents).
Thomas M. Barron argued the cause for respondent Joseph Tortoreto (Ferg, Barron, Mushinski & Gillespie, attorneys; Thomas M. Barron on the joint brief filed by respondents).
Robert J. Del Tufo, Attorney General of New Jersey, attorney for amicus curiae Division of Civil Rights (Andrea M. *292 Silkowitz, Assistant Attorney General, of counsel; Lynn B. Norcia, Deputy Attorney General, on the brief).
The opinion of the court was delivered by HAVEY, J.A.D.
In this action commenced in the Law Division under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, the central issue is whether plaintiff must prove overt sexual conduct in the work place to establish a claim of unlawful discrimination based on sexual harassment. We conclude that no such showing need be made. We hold that harassment based solely on gender, which creates a hostile and offensive work environment is sufficient to establish a prima facie case of sex discrimination under the LAD. We therefore reverse and remand for further proceedings.
The gravamen of plaintiff's complaint is that while she worked as a probationary dispatcher with the defendant Haddon Township Police Department, defendant Joseph Tortoreto, a police officer, intentionally created a hostile work environment which compelled her to resign from her position. Plaintiff claims that Tortoreto's conduct constituted an "unlawful employment practice" in that his pervasive and severe conduct violated plaintiff's "conditions ... of employment." N.J.S.A. 10:5-12a. She also alleges that Tortoreto's conduct and defendants' failure to correct the hostile working conditions resulted in her constructive discharge, and constituted a tortious interference with her prospective economic advantage. She seeks compensatory and punitive damages for severe emotional distress, and loss of earnings and other employment benefits. At the close of plaintiff's proofs during the jury trial, the trial court granted defendants' motion to dismiss plaintiff's complaint. See R. 4:37-2(b). The court found that there was no proof adduced showing improper sexual advances, touching or sexual language, and in any event Tortoreto's conduct was not so pervasive and offensive as to constitute harassment. The *293 court also dismissed plaintiff's constructive discharge and tortious interference claims, concluding that this was a case involving a "volunteer resignation."
Accepting plaintiff's testimony as true, and giving her all reasonable inferences drawn from the evidence, see Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969), her proofs established the following facts. In December 1986, at age 59, plaintiff was hired as a provisional dispatcher by the Haddon Township Police Department. Officer Tortoreto was assigned to train her. Tortoreto was against hiring plaintiff simply because she was a woman. It was his view that the dispatcher's position was a job for a male seeking employment as a police officer. During plaintiff's training, Tortoreto refused to answer her questions regarding various dispatching procedures, and often told plaintiff she was doing a "lousy" job. At one point, during lunch at a diner, Tortoreto stated in the presence of plaintiff and her friends that plaintiff was "doing a lousy job. She's never going to make it." It was plaintiff's impression that Tortoreto was trying to "[g]et rid of me."
Plaintiff is a fastidious woman. Occasionally, she would clean up the department offices and Tortoreto would object, stating that plaintiff was a dispatcher, not a cleaning woman. On a "regular basis," Tortoreto would "smear" the dispatcher's window with his hands and on occasions would kiss it, leaving his lip prints. The more plaintiff objected to Tortoreto's conduct, the more "he would do it to antagonize me." During one incident, after plaintiff had left his lip prints on the window, he told plaintiff to explain to "the next nice-looking girl that comes in that they're mine." Also, at one point, after plaintiff had told Tortoreto that she was allergic to cigar smoke, she came to work one morning and found the dispatcher's area filled with cigar smoke "so much so that it set off the [fire] alarm." All of the officers, including defendant Sergeant Walter Aaron, were smoking cigars, "blowing it all around me till I was upset."
*294 Tortoreto also made "sarcastic" and "arrogant" statements to plaintiff on the police radio which were heard by other dispatchers in the county. There were also instances where the officers used profane language "loud enough to make sure I heard," after plaintiff had complained to Tortoreto that she was offended by such language. When plaintiff called Tortoreto one evening on the radio to investigate a complaint filed by a young woman, Tortoreto asked plaintiff if she had told the woman about "my big gun," interpreted by plaintiff as being a reference to Tortoreto's genitalia. On another occasion Tortoreto reported to plaintiff that "I laid two women in one night last night" leaving plaintiff filled with "disgust."
After three months, plaintiff contacted defendant Chief of Police Robert Saunders and complained about Tortoreto's conduct. The chief referred plaintiff to Sergeant Aaron. When she did so, Sergeant Aaron simply stated: "did you tell the chief, he hired you[?]" According to plaintiff, conditions thereafter worsened, and no corrective action was taken concerning Tortoreto's conduct.
Plaintiff testified that Chief Saunders and Sergeant Aaron never advised her that her work was inadequate. In fact, after the completion of her 90-day probationary period, she received a written evaluation from Aaron stating that her job performance was "satisfactory." Nevertheless, plaintiff's probation was extended for an additional 90-days. Because plaintiff never heard of an extension of probation for other provisional employees, she requested an explanation from the chief, but received none. On April 10, 1987, plaintiff resigned from her dispatcher's position. She did so because "I tolerated all of the abuse I felt I should ... and nothing had been done ... about it." She testified that she was humiliated and embarrassed and had lost her self-esteem. She simply concluded "it just was not worth it." However, prior to her resignation, plaintiff had filed a complaint of unlawful discrimination on the basis of sex with the Division of Civil Rights (Division). The Division found probable cause for plaintiff's allegations, but plaintiff did not *295 pursue her administrative remedy. Instead, she filed the present action in the Law Division.

I
N.J.S.A. 10:5-12a provides:
It shall be unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, sex ... of any individual, ... to refuse to hire or employ or to bar or to discharge ... from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment....
Plaintiff argues that the hostile work environment created by Tortoreto violated her "terms, conditions or privileges of employment" and therefore gave rise to a sexual discrimination claim under the LAD. Defendants counter by asserting that no action exists under the LAD because there has been no proof of sexual advances, offensive touching or other conduct of an overtly sexual nature. No reported New Jersey case has dealt squarely with the issue. Our Supreme Court in Erickson v. Marsh & McLennan Co. Inc., 117 N.J. 539, 556, 569 A.2d 793 (1990), noted that sexual harassment, which creates a "hostile environment" because of "coercion" is prohibited by the LAD. However, Erickson involved a claim that consensual sexual relations between plaintiff's supervisor and a fellow worker created a hostile environment. The Court was not called upon to decide whether nonsexual conduct can constitute an actionable claim of hostile environment under the LAD.
Nevertheless, several federal courts have addressed the issue. Our Supreme Court has not hesitated to look to federal precedent which interprets Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e to § 2000e-17, "as a key source of interpretive authority" when dealing with claims under the LAD. Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990). In Meritor Sav. Bk. F.S.B. v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49, 58-59 (1986), the United States Supreme Court held that a claim of *296 "hostile environment" sexual harassment is a form of sex discrimination, actionable under Title VII, noting that federal guidelines prohibit such conduct if it is intended to interfere with an individual's work performance, or creates an intimidating, hostile or offensive work environment. In so finding, the Court relied on Rogers v. Equal Employ. Opportunity Comm'n, 454 F.2d 234, 238 (5th Cir.1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), a race discrimination case involving harassment in the work place, which held that:
[T]he phrase "terms, conditions, or privileges of employment" in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.... One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers.... [454 F.2d at 238.]
Meritor applied this reasoning to claims of sexual harassment, concluding that "[n]othing in Title VII suggests that a hostile environment based on discriminatory sexual harassment should not be likewise prohibited." 477 U.S. at 66, 106 S.Ct. at 2405, 91 L.Ed.2d at 59. See also Drinkwater v. Union Carbide Corp., 904 F.2d 853, 859-60 (3rd Cir.1990).
In Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3rd Cir.1990), the Third Circuit held that to make out a case under Title VII it is necessary only to show that gender is a substantial factor in the discrimination, and that if plaintiff "had been a man she would not have been treated in the same manner." Id. (quoting Tompkins v. Public Serv. Elec. & Gas Co., 568 F.2d 1044, 1047, n. 4 (3rd Cir.1977)). Andrews also held that to constitute impermissible discrimination under Title VII, the offensive conduct need not be of a sexual character. 895 F.2d at 1485. "Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." Id. (quoting Hall v. Gus Constr. Co., 842 F.2d 1010, 1014 (8th Cir.1988)). Similarly, the District of Columbia Circuit in McKinney v. Dole, 765 F.2d 1129 (D.C. Cir.1985), stressed that sexual harassment in the work *297 place need not take the form of sexual advances or other incidents with sexual overtones to be illegal under Title VII, holding:
any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII. [Id. at 1138]
Accord Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir.1987) (threats of physical violence and incidents of verbal abuse  calling plaintiff "Buffalo Butt"  properly considered).
What evolves from these federal cases is that an oppressive and hostile work environment, whether created by overt sexual conduct or nonsexual, offensive harassment based solely on gender, violates the "conditions of employment" provision of Title VII. There are compelling reasons to adopt this federal standard as the pertinent standard under the LAD. Because N.J.S.A. 10:5-12a precisely tracks the "terms, conditions or privileges of employment" language utilized by Title VII, federal cases interpreting that language are particularly persuasive. Also, nothing in the LAD even suggests that sexual conduct is a necessary element of a hostile environment claim. Indeed, the Legislature declared its opposition to all practices of discrimination when directed against "any person by reason of the ... sex ... of that person[.]" N.J.S.A. 10:5-3 (emphasis added).
Further, our Supreme Court has emphasized that discrimination based on gender is "peculiarly repugnant in a society which prides itself on judging each individual by his or her merits." Grigoletti, 118 N.J. at 96, 570 A.2d 903 (quoting Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 80, 389 A.2d 465 (1978)). In the context of gender-employment discrimination, the Court has stressed the principle that "the overarching goal of the [LAD] is nothing less than the eradication `of the cancer of discrimination.'" Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652, cert. denied sub nom., University of Medicine & Dentistry of N.J. v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 *298 L.Ed.2d 51 (1988) (quoting Jackson v. Concord Co., 54 N.J. 113, 124, 253 A.2d 793 (1969)). In our view, whether the offending conduct is in the form of sexual advances or intimidation and hostility toward a woman solely because she is a woman, the result is the same. Sexual harassment, whatever form it takes, imposes a sense of degradation, closes or discourages employment opportunity for women (or men) and essentially deprives them of "self-respecting employment." Andrews, 895 F.2d at 1483. Interpreting the LAD as prohibiting pervasive and hostile nonsexual harassment best serves the Act's underlying goal of eradicating discrimination in the work place.

II
Having determined that nonsexual harassment may constitute a violation of a woman's "conditions of employment," it is necessary to define the essential elements of a claim of harassment based on a hostile work environment under the LAD. We endorse the "totality of circumstances" standard applied by Andrews, which holds that a "plaintiff must establish `by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee.'" Id. at 1482 (quoting Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir.1989)). Andrews sets forth five "constituents" which must converge to bring a successful claim:
(1) the employees suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. [895 F.2d at 1482 (footnote omitted).]
Although these elements are not binding upon us in our interpretation of the LAD, see Castellano v. Linden Bd. of Ed., 158 N.J. Super. 350, 360, 386 A.2d 396 (App.Div. 1978), aff'd in part, rev'd in part on other grounds, 79 N.J. 407, 400 A.2d 1182 (1979), we are satisfied that they provide a sound, general guideline in evaluating claims under the LAD, but should be *299 applied based on the circumstances of each case "to the extent that their application is appropriate." Peper, 77 N.J. at 83, 389 A.2d 465.
As to the first element, intent to discriminate, Andrews notes that in cases involving sexual innuendo, pornographic material or sexual derogatory language, intent is implicit. However, when a hostile environment is created by conduct which is not overtly sexual, "[a] more fact intensive analysis will be necessary...." 895 F.2d at 1482, n. 3. "Harassment is pervasive when `incidents of harassment occur either in concert or with regularity.'" Id. at 1484 (quoting Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2nd Cir.1987). Moreover, under Title VII, sexual harassment must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor, 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982). It is the harasser's conduct which must be "pervasive or severe," not the alteration of the conditions of employment. Ellison v. Brady, 924 F.2d 872, 878 (9th Cir.1991). The required showing of severity or seriousness of the harassing conduct "varies inversely with the pervasiveness or frequency of the conduct." Id. See also Andrews, 895 F.2d at 1484 ("[t]he factfinder must not only look to the frequency of the incidents but to their gravity as well"). Finally, whether or not the harasser's conduct is pervasive and severe is evaluated from the perspective of the victim, not the harasser. Ellison, 924 F.2d at 878.
Andrews' third and fourth elements include both a subjective and objective standard. The subjective element (number three) focuses on whether the offensive conduct in fact injured this particular plaintiff, giving her a claim for judicial relief. 895 F.2d at 1483. However, the fourth element requires plaintiff to show conduct which "a reasonable woman" would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. Id. at 1482; *300 see also Ellison, 924 F.2d at 879. Such a standard shields employers from the idiosyncratic claims of the hypersensitive employee, but also allows legitimate claims bottomed on harassing conduct offensive to the objectively reasonable woman.
Considering plaintiff's proofs in a most favorable light, as well as all legitimate inferences that may be drawn therefrom, we are satisfied that the trial court erred in dismissing plaintiff's complaint, since the evidence and legitimate inferences "could sustain a judgment in plaintiff's favor." R. 4:37-2(b). Applying the Andrews test, the evidence suggests a persistent and hostile treatment of plaintiff by Tortoreto simply because she was a woman. Tortoreto admitted to plaintiff that he felt she should not have been given the dispatcher's position because it was "a man's job." His apparent resistance to her employment was not expressed in a single incident, but on numerous occasions. For three months he engaged in hostile conduct by making disparaging remarks about plaintiff to strangers, belittling her over the police radio, refusing to train her, smearing and kissing the dispatcher's window knowing of plaintiff's fastidious nature, condoning excessive cigar smoke in the dispatcher's area knowing of her allergies, and bragging to her of his sexual powers. This evidence could sustain a finding by a jury that Tortoreto's conduct was intentional, pervasive and regular.
A jury could also have concluded that plaintiff satisfied the subjective/objective elements under Andrews. Plaintiff testified that she was humiliated and embarrassed by Tortoreto's conduct. She lost her self-esteem and was frustrated because the chief and supervising sergeant took no corrective action. Because of her health and the frustration she felt, she had no other choice but to resign. As to the objective prong, we reject the implication raised by the trial court that plaintiff's reaction to Tortoreto's conduct was the eccentric response of a hypersensitive woman. The trial court observed that plaintiff is a "very neat lady ... I ... assume that in her home every little thing is in its place. She carried that over to the police station *301 and it was not honored there and that annoyed her." Whether a "reasonable woman" would consider Tortoreto's conduct sufficiently severe and pervasive to alter the conditions of employment and create an abusive working environment was a question to be resolved by the jury.
Andrews' fifth element, the existence of respondeat superior, is bottomed on agency principles. See Meritor, 477 U.S. at 72, 106 S.Ct. at 2408, 91 L.Ed.2d at 63. Liability exists against the employer if "management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action[.]" Andrews, 895 F.2d at 1486. In its amicus brief, the Division urges us not to adopt this element of the Andrews test, arguing that the harassing employee's conduct should be imputed to the employer under a direct liability theory. See Meritor, 477 U.S. at 78, 106 S.Ct. at 2411, 91 L.Ed.2d at 66 (Marshall, J. concurring). We need not address the issue, since on the facts before us there is no question that "management-level employees," Chief Saunders and Sergeant Aaron, had been told by plaintiff of Tortoreto's conduct during plaintiff's probationary period, and that no corrective steps were taken. Indeed, the trial court found that plaintiff complained to the chief "on two occasions" and the chief did nothing about it. Since the evidence established that supervisory personnel were on notice of the alleged harassment and failed to take corrective steps, defendants, including Haddon Township, are subject to liability under the LAD.

III
We are also satisfied that dismissal of plaintiff's constructive discharge and tortious interference claims must be reversed. As stated, the trial court dismissed these claims without discussion except to state that this was a case of a "volunteer resignation."
*302 On a claim of constructive discharge in a sex discrimination case, several federal cases have adopted a "reasonable person" test, which focuses on the impact of an employer's action, whether deliberate or not, upon the "reasonable" employee. See Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1231 (3rd Cir.1988); Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3rd Cir.1984). The court need "merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Id. Thus, constructive discharge is a "heavily fact-driven determination...." Levendos, 860 F.2d at 1230. Here, reasonable minds could differ as to whether a woman of reasonable sensitivity would have resigned from the dispatcher's position under the circumstances facing plaintiff.
We also reject defendants' argument that no action for constructive discharge exists because plaintiff did not have a contract of employment. In Kass v. Brown Boveri Corp., 199 N.J. Super. 42, 55, 488 A.2d 242 (App.Div. 1985), we held that where there is "a position-specific employment contract" and the employee resigns after the employer without justification forces the employee to choose among demotion, termination or resignation, the employer remains subject to liability unless the facts clearly demonstrate a fairly bargained release of the employer. Kass is distinguishable since it involved a claim of constructive discharge in the context of contract law. Plaintiff asserts a claim of discrimination under the LAD, based on a hostile employment environment.
The trial court also erred in dismissing plaintiff's tortious interference claim. In her complaint plaintiff alleges that the individual defendants interfered with "her stable employment and promotional opportunities," thereby causing her loss of earnings, benefits and severe emotional pain and anguish. In Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 563 A.2d 31 (1989), the Supreme Court held that a party to an existing or prospective contractual relationship *303 "cannot be held directly liable for tortious interference with that relationship, because the actions of the parties to a contract are judged under contract law." Id. at 760-61, 563 A.2d 31. See also Kopp, Inc. v. United Technologies, Inc., 223 N.J. Super. 548, 559, 539 A.2d 309 (App.Div. 1988).
The issue raised here was raised in Printing Mart: whether the agents or employees of a party to a contract can be held liable for tortious interference with a prospective contractual relationship, to which the principal is a party. 116 N.J. at 761, 563 A.2d 31. The Supreme Court declined to address the question because of the absence of a meaningful record, noting that resolution of the issue "may require the Court to create a special cause of action against the employee." Id. at 763, 563 A.2d 31. We also decline to address the issue in the absence of a more informative record. The legal question as to whether such a claim exists in the circumstances of this case should in the first instance be resolved by the trial court after a complete record is made.

IV
Finally, two evidentiary issues need to be addressed. Plaintiff argues that the trial court erred in denying the admission in evidence of the Division's probable cause determination entered in the agency proceedings prior to plaintiff's institution of her action in the Law Division. As stated, plaintiff abandoned her claim before the Division and instituted the present action. Plaintiff claims that the determination constitutes a written statement of a public official and thus is admissible under Evid.R. 63(15). The trial court excluded the evidence under Evid.R. 4 because its probative value was outweighed by its potential for prejudice.
Under Evid.R. 63(15), a hearsay statement is admissible if it is in the form of a written statement "of an act done, or an act, condition or event observed by a public official[.]" In Phillips v. Erie Lackawanna R.R. Co., 107 N.J. Super. 590, *304 594, 259 A.2d 719 (App.Div. 1969), certif. denied, 55 N.J. 444, 262 A.2d 700 (1970), Judge Conford noted that the intent of the drafters of Evid.R. 63(15) was "not to allow in evidence conclusionary material resulting from official investigations embodied in statements or reports of the official or agency involved." 107 N.J. Super. at 595, 259 A.2d 719 (emphasis added). Thus, Phillips held that the factual conclusions of a hearing examiner of the Public Utilities Commission regarding an alleged hazardous railroad crossing was not admissible in a wrongful death action. Id. at 606, 259 A.2d 719. See also Millison v. E.I. du Pont de Nemours & Co., 226 N.J. Super. 572, 595, 545 A.2d 213 (App.Div. 1988), aff'd, 115 N.J. 252, 558 A.2d 461 (1989); Biunno, Rules of Evidence, Evid.R. 63(15) Comment (Anno. 1991); but see Crispin v. Volkswagenwerk AG, 248 N.J. Super. 540, 553, 591 A.2d 966 (App.Div. 1991) ("[R]ecently, greater attention has focused upon the general reliability or trustworthiness of the public official's declaration").
The federal cases are split as to whether or not EEOC determinations of reasonable cause are admissible in Title VII cases. In Tulloss v. Near N. Montessori School, Inc., 776 F.2d 150, 153 (7th Cir.1985), the court found no abuse of discretion in excluding a reasonable cause determination, observing that:
the district judge may factor into his decision "the danger of unfair prejudice to the defendant" and that the "time spent by the defendant in exposing the weaknesses of the EEOC report would add unduly to the length of the trial." [Id. at 154 (quoting Johnson v. Yellow Freight System, Inc., 734 F.2d 1304, 1309 (8th Cir.), cert. denied, 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984)).]
Estes v. Dick Smith Ford, Inc., 856 F.2d 1097 (8th Cir.1988), as well holds that the trial court "must exercise its discretion ... to ensure that unfair prejudice does not result from a conclusion based on a cursory EEOC review of the very facts examined in depth at trial." Id. at 1105. But see Abrams v. Lightolier, Inc., 702 F. Supp. 509, 512 (D.N.J. 1988) (EEOC's finding of reasonable cause admissible in age discrimination action).
*305 The LAD provides alternative remedies for redress against or relief from unlawful discrimination: suit in the Superior Court, or the filing of a complaint with the Division. N.J.S.A. 10:5-13. When a complaint is filed with the Division, the Attorney General conducts a "prompt investigation" to determine if "probable cause exists for crediting the allegations of the complaint[.]" N.J.S.A. 10:5-14. Upon a finding of probable cause, the Attorney General attempts to eliminate the unlawful employment practice "by conference, conciliation and persuasion...." Id. A probable cause finding is a threshold step in the Division's administrative mechanism "to determine whether the matter should be brought to a halt or proceed to the next step ... to an adjudication on the merits." Frank v. Ivy Club, 228 N.J. Super. 40, 56, 548 A.2d 1142 (App.Div. 1988), rev'd on other grounds, 120 N.J. 73, 576 A.2d 241 (1990). In making the determination, the investigator is "not concerned with whether the information collected during the investigation was true or false  only whether it was reasonable to accept it as true and if so whether it justified consideration on the merits." 228 N.J. Super. at 56, 548 A.2d 1142. In short, the probable cause step is part of an administrative process intending to provide the claimant with a "swifter and less expensive" remedy than formal litigation. Sprague v. Glassboro State College, 161 N.J. Super. 218, 226, 391 A.2d 558 (App.Div. 1978).
We find no abuse of discretion by the trial court in excluding the probable cause determination. Clearly, it is not a written statement "of an act done," or an "event observed" by a public official. Evid.R. 63(15) (emphasis added). It is conclusory material compiled by an investigator for the Division solely for the purpose of determining whether there was any basis for continuing the administrative process. Further, the jury might well have placed undue significance on the investigator's "conclusion," when in fact the investigator makes no findings, but simply determines that the matter should proceed further. Moreover, we presume all of the evidence presented to the investigator will be presented to the jury for its ultimate and *306 independent resolution based on its judgment of the evidence presented during trial.
Twenty months after plaintiff left her employment with the police department, Tortoreto typed a "gag" teletype and disseminated among the police officers, which reads as follows:
Harry Gannon is one of the worst dispatchers in the history of civilian employment of the Haddon Township Police Department. We believe that he is the downfall and is a bigger bitcher than Helen the f____ face. National wire to all receivers; SAC NATO KGB and CIA.
The parties agree that "Helen" is a reference to plaintiff. Applying Evid.R. 4, the trial court excluded the teletype, concluding that "because of the passage of time ... it's much more prejudicial than it is beneficial." We do not agree.
The teletype was highly relevant because it reflected Tortoreto's state of mind toward plaintiff, and supported plaintiff's assertion that he created a hostile work environment because of his sex-biased animus. The fact that twenty months transpired before the teletype was issued was no reason to exclude the evidence. Indeed, the fact that Tortoreto was characterizing plaintiff as a "bitcher" and "Helen the f____ face" nearly two years after plaintiff left the department, underscores the strength of his antagonism toward plaintiff, and supports her claim that Tortoreto's pervasive and offensive conduct made working conditions intolerable during her employment with the department. Exclusion of the teletype was a mistaken exercise of the trial court's discretion under Evid.R. 4.
Reversed and remanded for further proceedings consistent with this opinion.