# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CLEVELAND INTEGRITY SERVICES, LLC, a Delaware Limited Liability Company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2024-0371-MTZ |
| RANDY BYERS, | ) ) ) | |
| Defendant. | ) | |
| CLEVELAND INTEGRITY SERVICES, LLC, a Delaware Limited Liability Company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 2024-0372-MTZ |
| MICHAEL FRYE, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  December 4, 2024
Date Decided:  February 28, 2025

Aaron P. Sayers, MCDERMOTT WILL & EMERY LLP, Wilmington, Delaware; Rachel B. Cowen, MCDERMOTT WILL & EMERY LLP, Chicago, Illinois, *Attorneys for Plaintiff Cleveland Integrity Services, LLC*.

Andrew L. Cole, Nathaniel J. Klepser, Austin R. Niggebrugge, COLE SCHOTZ P.C., Wilmington, Delaware, *Attorneys for Defendants Randy Byers and Michael Frye*.

**ZURN, Vice Chancellor.**

The plaintiff, an oil and gas pipeline inspection company, seeks to enforce restrictive covenants against two of its founders, who are former employees. The employees agreed to the restrictive covenants in 2013, when they sold their business. The employees remained with the company after the sale. Over the next eleven years, the company was sold two more times.

In early 2024, one of the founders resigned to start a competing business and recruited the other founder, and other plaintiff employees, to join his venture. Their business poached at least one customer from the plaintiff. Soon after, the plaintiff sued the founders for breach of the restrictive covenants and sought a preliminary injunction.

Two restrictive covenants are at issue: a noncompetition provision and a nonsolicitation provision. This opinion concludes the noncompetition provision is overbroad and unenforceable. But the nonsolicitation provision is enforceable, and the plaintiff is entitled to a preliminary injunction enforcing it.

## I.    BACKGROUND[1]

Plaintiff Cleveland Integrity Services, LLC ("Plaintiff") provides pipeline inspection services in the United States.[2] In 2023, it serviced customers in thirty-six states.[3] Plaintiff's customers have operations in the U.S., Canada, and Mexico,[4] but Plaintiff itself has only had one limited subcontracting agreement that sent its inspectors outside the U.S,[5] and it does not currently provide services outside the U.S.[6] Defendants Randy Byers and Michael Frye (together, "Defendants")

---

[1] Citations in the form of "POB" refer to Plaintiff's Opening Brief In Support Of Motion For Entry Of Preliminary Injunction, available at C.A. No. 2024-0371-MTZ docket item ("D.I.") 75. Citations in the form of "DOB" refer to Defendant Randy Byers's Brief In Opposition To Plaintiff Cleveland Integrity Services, LLC's Motion For Preliminary Injunction, available at D.I. 76. Citations in the form of "PRB" refer to Plaintiff's Reply Brief In Support Of Motion For Entry Of Preliminary Injunction, available at D.I. 81. Citations in the form of "DRB" refer to Defendant Randy Byers's Reply Brief In Opposition To Plaintiff Cleveland Integrity Services, LLC's Motion For Preliminary Injunction, available at D.I. 82. Defendant Michael Frye exchanged his own sets of briefs with Plaintiff. D.I. 67; D.I. 68; D.I. 72; D.I. 73. The Byers briefs and the Frye briefs are very similar, so this opinion cites the Byers briefs where the exhibits or points are also presented by the Frye briefs.

[2] POB Ex. 3 at Interrog. Resp. No. 15.

[3] *Id.*

[4] *Id.* at Interrog. Resp. Nos. 15, 18, 19; POB Ex. 6 at 14, 17, 20.

[5] POB Ex. 6 at 13–14.

[6] *Id.* ("Q. So it sounds like you are saying [Plaintiff's business is] not limited to the United States? A. Presently or in theory? Q. Well, let's start with presently? A. They presently do not have any operations or inspectors outside of the country."); POB Ex. 6 at 17 (distinguishing "customers that CIS had in Mexico" from "customers that CIS had that have assets in Mexico"); *see* POB Ex. 3 at Interrog. Resp. Nos. 15, 24 (describing customers based in the United States and Canada, and customer operations and/or

cofounded Plaintiff's predecessor Cleveland Integrity Services, Inc. ("CIS Inc." and together with Plaintiff, "Cleveland") in 2011 and remained Cleveland employees until 2024.[7]

In 2013, Nautic Partners ("Buyer 1") purchased CIS Inc. via a stock purchase

---

headquarters in the United States, Canada, and Mexico, but describing Plaintiff's provision of services as "nationwide" and "in 36 states" in 2023).

Plaintiff contends it bid on and obtained work in Canada, citing deposition testimony of the current CEO of Plaintiff's parent company. POB at 8 (citing POB Ex. 6 at 12–14). When the parent's CEO was pressed on that point at his deposition, he stated, "CIS has historically done a limited amount of work in Canada, but they don't have any up there right now." POB Ex. 6 at 13–14. When asked whether he was aware of any other work the company had performed in Canada, he stated, "That's the only instance I know of that they've had someone actually up there working. I mean, these clients will have assets that transfer over, so I don't know how that's germane. But, yeah, boots on the ground up there, it hasn't been frequent." *Id.* at 14. After being asked to clarify what "assets that transfer over" meant, he stated, "The companies and the relationships that we have are based in Canada, the United States, and into Mexico. So their assets in the relationships we have are North American-based. Whether or not we are performing boots-on-the-ground work in the continental United States, I am not sure how that's relevant, but that's for you guys to argue about, I guess." *Id.*

Other than that instance, Plaintiff does not argue it performed work outside the U.S. *See generally* POB. Instead, Plaintiff repeatedly refers to the fact that its customers have operations and assets outside the U.S. *Id.* at 7–8, 45; POB Ex. 3 at Interrog. Resp. Nos. 15, 18, 19, 24; *see also* POB Ex. 6 at 13–14, 17; Byers Dep. at 33, 36. Plaintiff's reply brief does not respond to the contention in Defendants' opening brief that despite Plaintiff's international customer base, its business "is confined to the continental United States." DOB at 15–16; *see generally* PRB. And Plaintiff has not provided evidence of plans to expand its business internationally. *Cf.* POB Ex. 6 at 20–21 ("Q. Besides [an affiliate entity's Mexican subsidiary], is there anything else that you specifically remember there being some discussion or plan to move into a different country? A. Again, I am not sure what you mean by move into. If your definition of this restriction is limited to boots on the ground, like I think that's a narrow definition. As I've said, the client relationships lie in a lot of different places in North America.").

[7] POB Ex. 1 at 15 [hereinafter "Byers Dep."]; POB Ex. 2 at 14 [hereinafter "Frye Dep."].

agreement (the "2013 SPA").[8] Byers received over $12 million in the sale, and Frye received approximately $2.8 million.[9] Byers and Frye were represented by counsel in that transaction.[10] As part of the 2013 SPA with CIS Inc. and Buyer 1, Defendants agreed to restrictive covenants, which Plaintiff now seeks to enforce.[11]

## A.    The Restrictive Covenants

Defendants agreed to two restrictive covenants as part of the 2013 SPA:  a noncompetition provision (the "Noncompete") and a nonsolicitation provision (the "Nonsolicit" and together with the Noncompete, the "Restrictive Covenants").  The Restrictive Covenants operate during a "Restricted Period" defined as the "later of (A) five (5) years from [closing] and (B) if applicable, two (2) years from the date of termination of employment with [CIS Inc.]"[12]

> The Noncompete provides that, during the Restricted Period, Defendants
>
> shall not directly or indirectly (including through an Affiliate) own, have an interest in, operate, join, control or participate in, or be connected with as an officer, employee, director, proprietor, member, manager, partner, investor, creditor, adviser, sales representative, agent, consultant or otherwise, any business similar to or competitive with the Business . . . anywhere in [North America].[13]

---

[8] Byers Dep. at 18; POB Ex. 4 [hereinafter "2013 SPA"].

[9] Byers Dep. at 23; Frye Dep. at 16–17.

[10] Byers Dep. at 25; POB Ex. 6 at 18–19.

[11] 2013 SPA § 7.5.

[12] *Id.* § 7.5(a).

[13] *Id.*

5

"Business" is defined as

> the business of [CIS Inc.] and its Subsidiaries, including without limitation the ownership and operation of the business of (i) providing inspection, integrity assessment, design and engineering, and maintenance and services to the oil and gas pipeline industry and the utility industry, and (ii) any other line of business in which, during the Restricted Period, [CIS Inc.] or any of its Subsidiaries is engaged or has plans to be engaged.[14]

The Nonsolicit provides that, during the Restricted Period, Defendants

> shall not, directly or indirectly (including through an Affiliate):

> (i) (A) hire, offer to hire, solicit for hire, or attempt to do any of the foregoing, any Person who is or was at any time during the Restricted Period an officer, manager or employee of [CIS Inc.] or any Subsidiary of Parent [Holdco] or an agent or consultant to [CIS Inc.] or a Subsidiary of Parent [Holdco], or (B) divert, entice away, or in any other manner persuade or encourage any person who is or was at any time during the Restricted Period an officer, manager or employee of [CIS Inc.] or a Subsidiary of Parent [Holdco] to terminate such person's employment with [CIS Inc.] or such Subsidiary of Parent [Holdco], accept employment with a third party, or engage in any of the activities prohibited under Section 7.5(a) above, or subparagraph (ii) below; or

> (ii) solicit, divert, entice away, or in any other manner persuade or encourage, or attempt to solicit, divert, entice away, persuade or encourage, any customer, partner, joint venturer, referral source, payor, supplier, vendor, licensee, licensor, developer, consultant or other business relation of [CIS Inc.] or any Subsidiary of Parent [Holdco] during the Restricted Period, to cease doing or materially reduce its business with [CIS Inc.] or such Subsidiary of Parent [Holdco], or in any way interfere with the relationship between any such third party, on the one hand, and [CIS Inc.] or any Subsidiaries of Parent [Holdco],

---

[14] *Id.* § 1.1. Cleveland has never had subsidiaries. POB Ex. 3 at Interrog. Resp. No. 17.

on the other hand.[15]

The 2013 SPA defines "Affiliate" to include the specified individual's family members as well as any entity "directly or indirectly controlling, controlled by or under direct or indirect common control with" such individual.[16]

## B. Defendants' Cleveland Roles

Byers has held several roles in the Cleveland corporate structure. Before he sold CIS Inc., he was the company's president.[17] He was suited for the role, having worked in pipeline inspection from the age of thirteen and having built an industry reputation through prior leadership positions in pipeline inspection at four companies.[18]

---

[15] 2013 SPA § 7.5(b). "Parent Holdco" refers to Applied-Cleveland Holding Company, LLC. After the 2013 SPA, Buyer 1 indirectly held CIS Inc.'s stock through a chain of subsidiaries. Beneath Buyer 1 sat Parent Holdco, then Applied-Cleveland Acquisition Holdings Corp., and finally Applied-Cleveland Holdings, Inc., which this decision refers to as "Parent." D.I. 86. Because Parent was a subsidiary of Parent Holdco, the Nonsolicit applies to Parent's subsidiaries. *See* 2013 SPA § 7.5(b); D.I. 86.

Section 7.5(c) of the 2013 SPA contains an acknowledgement by Defendants that the Restrictive Covenants are reasonable and purports to mandate blue-penciling if part of either Restrictive Covenant is held to be unenforceable. 2013 SPA § 7.5(c).

[16] 2013 SPA § 1.1.

[17] Byers Dep. at 15, 18.

[18] *See id.* at 11–14, 70–74; *see also id.* at 12 (noting he was a partner at pipeline inspection company Third Party Resources); *id.* at 12–13 (noting his position as vice president of operations at H.K. Ward & Associates, which provided inspection services); *id.* at 13 (noting his position as director of pipeline services at environmental services firm Louis Berger Resources); *id.* at 14 (noting his position as senior vice president and general manager of Englobal Inspection Services).

In connection with the 2013 SPA, Defendants executed employment agreements with CIS Inc. Byers's employment agreement named him president and CEO of CIS Inc. throughout his initial term and any renewal term.[19] Frye's named him as CIS Inc.'s vice president of operations.[20] Each employment agreement provided for an initial five-year term, which would automatically renew for successive one-year periods unless either party to the agreement provided sixty-days' written notice of termination.[21]

Byers served an important customer relations function at Cleveland.[22] Over the course of his career, Byers had built extensive relationships in the oil and gas industry that were valuable to Cleveland.[23] His experience and relationships allowed him to network with clients and potential clients while at Cleveland, and to mentor other Cleveland employees in dealing effectively with customers.[24] As a Cleveland employee, Byers attended industry events alongside other employees, clients, and prospective clients to generate new business and maintain relationships with current

---

[19] POB Ex. 8.

[20] POB Ex. 9.

[21] POB Ex. 8 § 2.4; POB Ex. 9 § 2.4.

[22] *See, e.g.*, POB Ex. 16 at 93.

[23] POB Ex. 6 at 23, 25; Byers Dep. at 70–75; *see* POB Ex. 11 at 72 (testifying that "Byers' name had good brand value in the marketplace"); Byers Dep. at 11–14 (describing lifelong experience in the pipeline inspection industry).

[24] POB Ex. 11 at 29–30 (testifying that Byers was a source of "advice and counsel about clients").

8

customers.[25] These included conferences, golf outings, hunting outings, and dinners.[26] In some cases, Cleveland sponsored the events because of the networking opportunities they provided.[27]

In 2015, Byers became chairman and CEO of CIS Inc.'s parent company, Applied-Cleveland Holdings, Inc. ("Parent").[28] At the time of the 2013 SPA, Parent owned CIS Inc. and two other subsidiaries: Applied Consultants, Inc. and Central NDT, Inc.[29] Applied Consultants is a pipeline inspection company that provides services nationwide.[30] During Byers's tenure as Parent CEO, Applied Consultants formed a Mexican subsidiary that provides inspection services in Mexico.[31] Applied Consultants has tried to expand into the Caribbean and Canada as well.[32] Central NDT provides nondestructive testing services to oil and gas companies nationwide.[33]

In 2018, Parent acquired two more subsidiaries: Perennial Environmental I, LLC ("Perennial") and Encompass Services, LLC ("Encompass").[34] Perennial

---

[25] *Id.*; POB Ex. 16 at 93–94; POB Ex. 6 at 81.

[26] POB Ex. 16 at 93–94; POB Ex. 6 at 81; *see* POB Ex. 11 at 29–30.

[27] POB Ex. 11 at 29–30.

[28] Byers Dep. at 34.

[29] *Id.* at 20.

[30] POB Ex. 3 at Interrog. Resp. No. 15.

[31] *Id.*; Byers Dep. at 34.

[32] POB Ex. 3 at Interrog. Resp. No. 15; POB Ex. 6 at 20.

[33] POB Ex. 3 at Interrog. Resp. No. 15.

[34] Byers Dep. at 38.

offers permitting and compliance services to customers nationwide.[35] Encompass provides surveying services to customers based in the U.S., Central America, the Caribbean, and Canada.[36] Parent's current CEO testified that Encompass provided services in Panama as recently as 2023 and maintained an office in Canada at one point.[37] The acquisitions were meant to expand Parent's services and enable the subsidiaries to sell those services across their customer bases, creating synergies among the subsidiaries.[38] In connection with those acquisitions, Parent rebranded itself as Eagle Infrastructure Services, Inc. to reflect its broader services.[39]

Byers remained Parent's chairman and CEO, where he had ultimate responsibility not only for CIS Inc., but for the other Parent subsidiaries—Applied Consultants, Central NDT, Perennial, and Encompass (collectively, the

---

[35] POB Ex. 3 at Interrog. Resp. No. 15.

[36] *Id.*

[37] POB Ex. 6 at 21.

[38] Byers Dep. at 38–39 ("Q. And the strategic reason to acquire Perennial and Encompass was to grow additional services that could be provided to the customers of [Parent] or Applied; correct? A. Yes. Q. And the strategy was that each of these four companies would begin to cross-sell and get deeper relationships with the customers; correct? A. Yes."); POB Ex. 6 at 105–06 ("[C]ross-selling has been a big focus and push."); Byers Dep. at 91 ("Q. And one of the things that had happened under your tenure is that the other entities, like Encompass and Perennial, began providing services to companies . . . that had previously been either just Applied or Cleveland customers? A. We had made some progress. We were not where we had all hoped to be. There wasn't a lot of cross-selling at that time. Q. There was or was not? A. Was not. It was always the hope and the plan, but the follow-through wasn't so good.").

[39] Byers Dep. at 39.

"Subsidiaries").[40]  Another employee took over Byers's role as president of CIS Inc.[41]  No one held the title of CEO of CIS Inc. at that point.[42]  Byers remained on CIS Inc.'s payroll, and neither he nor CIS Inc. terminated his employment agreement.[43]

In his role at Parent, Byers had access to the Subsidiaries' confidential information, including financials, pricing information, customer lists, and an employee database containing information regarding performance, roles and responsibilities, and clients serviced.[44]  He also had access to the organization's Salesforce platform, a customer-relationship-management tool that Parent and the Subsidiaries used to share confidential customer information, but he did not regularly use that platform.[45]  Byers possessed some confidential information related to Parent's business in hard copy form.[46]

In 2023, after Cleveland faced financial distress and was acquired by another

---

[40] *Id.* at 41.

[41] *Id.* at 41–42.

[42] *See* DOB Ex. 10 ¶¶ 13–14.

[43] *See* Byers Dep. at 43–44, 46.

[44] POB Ex. 6 at 31–36.

[45] *Id.* at 36–37 ("Q. Wasn't one of the company's complaints about Mr. Byers is he didn't use Salesforce?  A. The question wasn't whether or not he used it, the question was whether or not he had access to it.  And yes, there was some concern on my part to the fact that Mr. Byers was not adequately documenting and communicating the client contacts that he was supposed to be having."); *see* POB Ex. 11 at 182.

[46] *See* POB Ex. 6 at 34.

11

company out of bankruptcy, Byers was demoted to a business development representative role at Parent.[47] His responsibilities included nurturing key customer relationships, attending biweekly Parent business development calls to add value through his existing client relationships, and "being an active participant in Salesforce" by making timely entries in the platform.[48] Parent tasked two other business development employees with "action items" to ensure Byers would add value in his new role.[49] These included training Byers on proper Salesforce use and setting measurable goals for him within Salesforce.[50] Byers retained confidential information relating to Parent's business in hard copy even after he was demoted.[51]

Despite the change in title, Byers remained on Cleveland's payroll.[52] Neither Byers nor Cleveland terminated his employment agreement, and Cleveland "continue[d] to pay [Byers's] salary and benefits."[53]

---

[47] Byers Dep. at 46, 96; POB Ex. 6 at 75–77; DOB Ex. 20.

[48] DOB Ex. 20; POB Ex. 6 at 75–79.

[49] DOB Ex. 20; POB Ex. 6 at 77–78.

[50] DOB Ex. 20; POB Ex. 6 at 77–78.

[51] *See* POB Ex. 6 at 33–34.

[52] Byers Dep. at 56–57. Byers does not contend he experienced any reduction in salary, referring only to his reduced status and role. *See* DOB at 38–40; DRB at 7, 18; *see also* POB Ex. 6 at 77 ("[Byers] was collecting a pretty large, for our organization structure, salary, a lot of benefits, and a lot of expenses for travel and entertainment from the Cleveland organization, and they wanted to see a return on value for that."); Byers Dep. at 44 ("Q. And you continued to collect a paycheck . . . from Cleveland all the way through 2024?" A. Correct.").

[53] Byers Dep. at 37; *accord* DOB Ex. 10 ¶¶ 13–14.

As for Frye, he began his tenure as Cleveland's vice president of operations, then became its chief accounting officer.[54] He did not interface with customers to the extent Byers did, but he had significant access to customer and employee information. Frye executed general contracting functions, coordinated with CPAs on annual audits, performed accounts receivable and payable functions, managed company credit lines, and supervised most of Cleveland's back-office processes.[55]

On January 15, 2021, Frye submitted "formal notice of [his] resignation from the position of Chief Accounting Officer . . . effective April 2, 2021."[56] The notice stated, "If there is a desire, I am open to remaining engaged in some capacity after April 2nd but we would need to discuss the terms and conditions of such an arrangement."[57] But Frye did not follow through with his resignation.[58] Frye "had expressed concern when he had given that notice of resignation that he felt overworked and lacked appropriate resources," but "the company committed to hire more people to help him, and he ended up staying with the company."[59] Frye experienced no break in service or reduction in salary after giving notice, and he

---

[54] Frye Dep. at 20–21.

[55] *Id.* at 14–15.

[56] C.A. No. 2024-0372-MTZ D.I. 68 Ex. 16.

[57] *Id.*

[58] Byers Dep. at 56; Frye Dep. at 19–20.

[59] Byers Dep. at 56.

remained Cleveland's chief accounting officer until he resigned in February 2024.[60]

## C. Cleveland Is Acquired Twice.

After Defendants agreed to the Restrictive Covenants in 2013, those promises were buffeted by two subsequent transactions. Three years after Buyer 1 purchased CIS Inc. and secured the Restrictive Covenants in the 2013 SPA, it sold CIS Inc. to another private equity firm, First Reserve ("Buyer 2"), via another stock purchase agreement (the "2016 SPA").[61] Owl Rock Capital Corp. ("Lender") financed that acquisition.[62] Section 7.13 of the 2016 SPA contained a covenant to terminate a broadly defined set of contracts and obligations—excluding contracts listed in a corresponding schedule—and to deliver evidence of such termination to Buyer 2.[63]

In 2023, CIS Inc. went through bankruptcy. The previous year, Lender had declared a default and negotiated an agreement to purchase CIS Inc.'s assets through a prepackaged Chapter 11 bankruptcy.[64] CIS Inc. transferred "[a]ll rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees" to Plaintiff under an asset purchase agreement (the "APA").[65] When I

---

[60] *Id.* at 57.

[61] POB Ex. 5 [hereinafter "2016 SPA"].

[62] DOB Ex. 6.

[63] 2016 SPA § 7.13, Schedule 7.13.

[64] *See* DOB Ex. 15; POB Ex. 6 at 38–39.

[65] POB Ex. 14 § 2.1.

14

ruled on Plaintiff's motion for a temporary restraining order, I held the Restrictive Covenants survived the APA.[66]

### D. Formation Of Byers & Partners And Resignations From Plaintiff

Around December 2023—while Defendants were still employed at Cleveland—Byers and his spouse, Cheryl Byers,[67] began discussing plans to form a new pipeline inspection company that would compete with Cleveland.[68] At that time, they did not intend for Byers to have any initial role in the company; Byers intended to take at least three months off after leaving Cleveland.[69]

But by early January, Byers had communicated plans to form his company to Frye and two other Cleveland employees: Bradley Harmon (a Cleveland executive vice president involved in business development)[70] and David Travis (Cleveland's manager of field services).[71] Harmon was the "face" of Cleveland by that point, and Travis brought in "a great deal" of Cleveland's business.[72] Byers

---

[66] D.I. 26.

[67] Because this opinion refers to two members of the Byers family, I use Cheryl Byers's first name in pursuit of clarity. I intend no familiarity or disrespect.

[68] Ex. 11 at 38.

[69] POB Ex. 16 at 45; Byers Dep. at 77.

[70] POB Ex. 11 at 23.

[71] Frye Dep. at 27.

[72] Byers Dep. at 86–87.

15

invited all three to join the new company and talked to them about what to name it.[73]

Byers, Frye, Harmon, and Travis favored naming the company "Byers and Associates"[74] to take advantage of Byers's reputation in the industry.[75]

Byers did not think these discussions with current Plaintiff employees were inappropriate because he "didn't think any of [them] had restrictions."[76] Byers was "pretty confident" his own restrictions "didn't hold up in Oklahoma but wasn't considering Delaware."[77] Byers knew Harmon had also agreed to restrictive covenants, but recalled Harmon telling him the covenants were unenforceable.[78]

The Byerses worked with counsel to form Byers & Partners, LLC as the new company's operating entity, and Our Gang Energy, Inc. ("Our Gang") as its sole

---

[73] *Id.* at 61–62 ("Q. Now, as you were exchanging these text messages with Mr. Harmon and Mr. Frye, there was an understanding that not only would they invest, but that they would become employed and work at the company; correct? A. Yes."); *id.* at 62 ("Q. And there was also an understanding with David Earl Travis in this time frame that he also would come work for and become an investor in the company; correct? A. Yes."); Frye Dep. at 25 ("Q. And Mr. Byers asked Mr. Travis to be a part of the company? A. I think he was assumed. [Travis] and [Harmon] are a matched set."); POB Ex. 11 at 38–41 (testifying Harmon discussed with Byers the prospect of forming a competing company, the enforceability of his restrictive covenants, and his salary upon joining Byers & Partners); Byers Dep. at 23 ("Q. And so Mr. Byers, he then raised the prospect of starting a new business with you and Mr. Harmon; is that correct? A. The prospect was to separate themselves from Cleveland Integrity, yeah, and asked me if I wanted to participate -- if I wanted to participate in that.").

[74] POB Ex. 17.

[75] POB Ex. 11 at 54–58, 70–72; POB Ex. 18.

[76] Byers Dep. at 57–58.

[77] *Id.* at 58.

[78] *Id.* at 57–58.

member and investment vehicle.[79]  Byers, Cheryl, and Frye were each involved to some degree in setting up the corporate structure,[80] though Byers testified it was "more Cheryl's" responsibility.[81]  Cheryl is the head of Byers & Partners.[82]

Once Byers & Partners and Our Gang were formed, the Byerses invested $1.2 million in marital assets under Cheryl's name.[83]  Frye, Harmon, Travis, and their spouses also invested in Our Gang.[84]  Byers was "very involved" in soliciting investors.[85]  In addition to recruiting Frye, Harmon, and Travis, he emailed other prospective investors, made phone calls, and hosted a meeting to recruit investors at the Byerses' lodge.[86]  In total, the Byerses recruited twenty investors for Our Gang.[87] These investors include individuals with connections to current Plaintiff customers and several individuals employed by Plaintiff when this action began.[88]

---

[79] *See* POB Ex. 19; POB Ex. 20; POB Ex. 21; *see* POB Ex. 16 at 44; *see also* Byers Dep. at 112.

[80] *See* POB Ex. 19; POB Ex. 20; POB Ex. 21.

[81] Byers Dep. at 112; *see* POB Ex. 19; POB Ex. 20; POB Ex. 21.

[82] Frye Dep. at 26.

[83] POB Ex. 16 at 44; POB Ex. 22.

[84] *See* POB Ex. 22; Byers Dep. at 61–62, 135–36.

[85] Byers Dep. at 47.

[86] POB Ex. 23; POB Ex. 24; POB Ex. 25; POB Ex. 26; POB Ex. 27; POB Ex. 28; POB Ex. 29; POB Ex. 30; POB Ex. 31.

[87] POB Ex. 22.

[88] *See* Byers Dep. at 68–72; POB Ex. 23; POB Ex. 24; POB Ex. 25; POB Ex. 26; POB Ex. 27; POB Ex. 28; POB Ex. 29; POB Ex. 30; POB Ex. 31; *see also* Byers Dep. at 104–05, 107, 116.

On February 27, 2024, Byers resigned from Plaintiff.[89] The same month, Frye, Harmon, and Travis each resigned from Plaintiff and joined Byers & Partners.[90] Once they joined, Frye, Harmon, and Travis reported to Cheryl as the head of the company.[91] The recruits soon began soliciting Plaintiff customers alongside Byers. Around March, Byers, Harmon, and Travis met twice with employees of Plaintiff customer Southern Star Central Gas Pipeline in hopes of gaining its business.[92] In one of those meetings, the customer indicated its desire to shift some of the services it currently received from other providers to Byers & Partners the following year.[93] Byers & Partners now has a master service agreement with Southern Star.[94]

Byers, Frye, and Travis then visited a representative of Plaintiff customer Duke Piedmont to try to secure its business.[95] Harmon reached out to a third Plaintiff customer about attending a golf tournament, again hoping to secure the customer's business.[96] Harmon and Byers collectively solicited at least five Plaintiff customers,

---

[89] Byers Dep. at 83–84.

[90] Frye Dep. at 28, 47; POB Ex. 11 at 36–37; D.I. 1 ¶ 25.

[91] *See* POB Ex. 11 at 62–63.

[92] POB Ex. 11 at 84–90.

[93] *See id.* at 90.

[94] *See id.* at 122.

[95] *See id.* at 118–19.

[96] POB Ex. 37; POB Ex. 11 at 159.

two of which now have service agreements with Byers & Partners.[97]

### E. Procedural History

On April 9, 2024, Plaintiff filed its complaint, a motion to expedite, and a motion for a temporary restraining order against Defendants.[98] After briefing and oral argument, I granted the TROs on June 4.[99] But Byers continued attending industry events to promote Byers & Partners, prompting Plaintiff to file a motion for contempt.[100] On August 29, I denied the motion for contempt, but modified the TRO to enjoin Defendants from attending industry events, socializing with industry participants, socializing with people who represent customers, and wearing Byers & Partners branded swag.[101]

On September 12, Plaintiff filed a motion for preliminary injunction, initially seeking to enforce both Restrictive Covenants against both Defendants.[102] Plaintiff modified its requested relief when it submitted its opening brief, and it now seeks to enforce the Noncompete against both Defendants, and the Nonsolicit against

---

[97] POB Ex. 11 at 113, 119–20, 122, 125.

[98] *Cleveland Integrity Servs., LLC v. Byers*, C.A. No. 2024-0371-MTZ (Del. Ch.); *Cleveland Integrity Servs., LLC v. Frye*, C.A. No. 2024-0372-MTZ (Del. Ch.). Parent sued Harmon the same day to enforce a restrictive covenant in a different agreement. *Eagle Infrastructure Super Holdco v. Harmon*, C.A. No. 2024-0374-MTZ (Del. Ch.).

[99] D.I. 29.

[100] D.I. 43.

[101] D.I. 56; D.I. 58.

[102] D.I. 57; C.A. No. 2024-0372 D.I. 53.

Byers.[103]  Plaintiff also "asks the Court to find that Byers, Frye, and their spouses must divest their interest in Our Gang, and that Cheryl . . . be enjoined from owning, operating, or having any involvement in Our Gang and Byer & Partners."[104]  Plaintiff further requests Byers and Frye continue to be prohibited from attending industry events and promoting Byers & Partners.[105]  The parties briefed Plaintiff's motion, and offered oral argument on December 4.[106]

## II.    ANALYSIS

"This Court has broad discretion to grant or deny a preliminary injunction."[107] To obtain a preliminary injunction, the movant must demonstrate:  (i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction.[108]  A party showing a reasonable probability of success must demonstrate

---

[103] D.I. 75, Proposed Order; C.A. No. 2024-0372 D.I. 67, Proposed Order; *see* DOB at 36.

[104] POB at 36–37.

[105] D.I. 26; D.I. 75, Proposed Order; C.A. No. 2024-0372 D.I. 67, Proposed Order.  Initially, Plaintiff specifically requested that Byers and Frye continue to be prohibited from wearing Byers & Partners branded swag.  D.I. 57; C.A. No. 2024-0372 D.I. 53.  Its opening brief did not explicitly address that request, though such conduct would likely fall under the requested prohibition on activities designed to promote Byers & Partners.  *See* D.I. 75, Proposed Order; C.A. No. 2024-0372 D.I. 67, Proposed Order.

[106] D.I. 84.

[107] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 1223782, at *3 (Del. Ch. Mar. 24, 2010).

[108] *Pell v. Kill*, 135 A.3d 764, 783 (Del. Ch. 2016).

20

"that it will prove that it is more likely than not entitled to relief."[109]  A preliminary injunction "is not granted lightly," and "the moving party bears a considerable burden in establishing each of these necessary elements."[110]

Plaintiff seeks a preliminary injunction enforcing restrictive covenants. "[A]greements not to compete must be closely scrutinized as restrictive of trade."[111] "Because the specific enforcement of such covenants involve important interests of commercial enterprises and of individuals seeking to support themselves and their families financially, and because, in that setting, the court is asked to exercise its distinctively equitable powers, each such case requires a careful evaluation of the specific facts and circumstances presented."[112]  Restrictive covenants are enforceable when they (i) are valid under general principles of law, (ii) are reasonable in their scope and effect, (iii) bear a reasonable relationship to the advancement of legitimate interests, and (iv) survive a balancing of the equities.[113]

---

[109] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049, 1067 (Del. 2014) (quoting *Mitchell Lane Publ'rs, Inc. v. Rasemas*, 2014 WL 4925150, at *3 (Del. Ch. Sept. 30, 2014)).

[110] *Fletcher Int'l*, 2010 WL 1223782, at *3 (alterations omitted) (quoting *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del. Ch. 2007)).

[111] *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977).

[112] *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987).

[113] *Sunder Energy, LLC v. Jackson* ("*Sunder Energy I*"), 305 A.3d 723, 746 (Del. Ch. 2023) *aff'd in part, rev'd in part on other grounds*, 2024 WL 5052887 (Del. Dec. 10, 2024).

"A non-competition agreement will only be enforced to protect the legitimate economic interests of the employer. Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse."[114] Generally, covenants not to compete in the context of a business sale are subject to a "less searching" inquiry than if the covenant "had been contained in an employment contract."[115]

Delaware courts evaluate restrictive covenants "holistically and in context."[116] "A court must not tick through individual features of a restriction in isolation, because features work together synergistically."[117] Courts generally assess the validity of a restrictive covenant at the time of contracting; then, "[a]ssuming that there is a valid covenant, the request for specific performance raises other issues that do not focus upon the time of contracting, but upon the time of enforcement."[118] But where a restrictive covenant advances an employer's interest in expanding into new

[114] *Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992).

[115] *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004).

[116] *Sunder Energy I*, 305 A.3d at 753.

[117] *Id.*

[118] *Delaware Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *11 (Del. Ch. Oct. 23, 2002) (alteration in original) (quoting *Bernard Personnel Consultants, Inc. v. Mazarella*, 1990 WL 124969, at *3 (Del. Ch. Aug. 28, 1990)).

markets, a court may also assess the covenant's scope based on its reasonableness at the time of enforcement.[119]

In considering whether a covenant advances a legitimate interest, this Court has considered whether the plaintiff has demonstrated an interest in protecting not only the plaintiff, but also the plaintiff's affiliates.[120] "Including affiliates in a restrictive covenant greatly expands the covenant's breadth, and therefore requires a broader legitimate economic interest."[121] Access to the affiliates' confidential information is generally necessary to justify a restrictive covenant that includes affiliates.[122]

---

[119] *See Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015) (reasoning the noncompete's scope was reasonable in large part because, at the time of enforcement, the employer's business had expanded into much of the restricted area where it previously did not provide services); *id.* at *20 n.236 ("If [the employer's] business, in fact, had not expanded to cover nearly all of the states subject to the Restrictive Covenants, the geographical reasonableness of the Covenants might have presented a closer question."); *see also Lewmor, Inc. v. Fleming*, 1986 WL 1244, at *2 (Del. Ch. Jan. 29, 1986) ("A restrictive covenant may be valid because at the time negotiated it was reasonably crafted to go no further than the legitimate economic interests of the employer warranted and because it was otherwise appropriately limited in time and space, but yet may not be specifically enforceable in the circumstances presented at the time of the application for such enforcement.").

[120] *Fortiline, Inc. v. McCall*, 2024 WL 4088629, at *4 (Del. Ch. Sept. 5, 2024).

[121] *Id.*

[122] *See Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924, at *18 (Del. Ch. Jan. 4, 2023), *rev'd on other grounds*, 312 A.3d 674 (Del. 2024) ("There is no indication that Plaintiffs had access to any kind of information . . . that would warrant that restriction."); *Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 5240507, at *11 (Del. Ch. Oct. 6, 2022) ("At most, [the parent company] has demonstrated [the defendant] knew [the company's] confidential information and certain confidential information of a limited number of truss affiliates . . .

"Where noncompete or nonsolicit covenants are unreasonable in part, Delaware courts are hesitant to 'blue pencil' such agreements to make them reasonable."[123] When the policy against unreasonable restraint on trade calls a court to strike a covenant and decline to blue pencil it, the court is unhindered by a provision in that same uneven agreement that purports to promote blue penciling.[124] And "an employee's promise not to challenge the reasonableness of his restrictive covenants cannot circumvent this Court's mandate to review those covenants for reasonableness."[125]

### A. The Restrictive Covenants Are Valid Contractual Promises.

Defendants do not dispute that the 2013 SPA was a valid contract when it was executed. Instead, Defendants argue the 2013 SPA and its Restrictive Covenants did not survive the 2016 SPA or APA. The Restrictive Covenants survived both

---

. I conclude [the parent company] lacks a legitimate economic interest to protect confidential information unrelated to truss and lumber operations that would justify restraining [the defendant's] employment."); *Fortiline*, 2024 WL 4088629, at *4–5 ("Where a plaintiff fails to show any legitimate business interest served by shielding all its unspecified affiliates from the restrained party's competition, and fails to show the restrained party had access to any kind of information that would warrant that restriction, the plaintiff has failed to justify the restrictive covenant as drafted.").

[123] *Kodiak*, 2022 WL 5240507, at *4; *see also Sunder Energy, LLC v. Jackson* ("*Sunder Energy II*"), 2024 WL 5052887, at *25–33 (Del. Dec. 10, 2024) (collecting cases and declining to craft a bright-line rule for when blue-penciling is appropriate).

[124] *See Sunder Energy I*, 305 A.3d at 753; *Kodiak*, 2022 WL 5240507, at *4; *see also Sunder Energy II*, 2024 WL 5052887, at *10 (characterizing *Kodiak* as an exercise of the Court's discretion not "to blue pencil when the circumstances and equities do not support that relief").

[125] *Kodiak*, 2022 WL 5240507, at *6.

24

transactions. First, the Restrictive Covenants survived the 2016 SPA, remaining valid contractual promises between Defendants and CIS Inc. as parties to the 2013 SPA. Section 7.13's covenant to terminate a broad category of contracts between affiliates includes the 2013 SPA.[126] But Section 7.13 is not a self-executing provision: somebody must terminate those contracts and provide proof of that termination.[127] The parties have presented no evidence that the 2013 SPA or the Restrictive Covenants were terminated, or that any such proof was provided. And second, as I have already held, the Restrictive Covenants remain valid contractual promises after the bankruptcy and APA.[128]

---

[126] *See* 2016 SPA § 7.13.

Section 7.13 applies to any "Contract" between Applied-Cleveland Acquisition Holdings Corp. or any of its subsidiaries, on one hand, and any "Non-Company Affiliate," on the other (such an agreement, an "Affiliate Arrangement"), except as to matters listed in Schedule 7.13. *Id.* "Non-Company Affiliate" is defined to include the "Seller" in the 2016 SPA—i.e., Parent Holdco. *Id.* at Preamble, § 4.22.

There is no dispute that the 2013 SPA was a Contract. Plaintiff disputes that it was an Affiliate Arrangement. *See* PRB at 3–7. The plain text establishes it was. CIS Inc.—an Applied-Cleveland Acquisition Holdings Corp. subsidiary—stood on one side of the 2013 SPA. *See* 2013 SPA; D.I. 86. Parent Holdco—a Non-Company Affiliate—stood on the other. 2013 SPA. So the 2013 SPA was an Affiliate Arrangement. Because it was not listed in Schedule 7.13, Section 7.13 applies to it. 2016 SPA § 7.13.

[127] *See* 2016 SPA § 7.13 ("Prior to the Adjustment Time, except for those matters set forth on Schedule 7.13, the Seller and the Company shall cause to be terminated, any Contracts between the Company or any Company Subsidiary, on the one hand, and any Non-Company Affiliate, on the other hand, in full without any consideration or further liability to the Company and the Company Subsidiaries and the Seller or the Company shall deliver to Purchaser evidence of such termination in a form reasonably acceptable to Purchaser.").

[128] D.I. 26 at 4. Defendants' only arguments that the Restrictive Covenants were not assumed in the bankruptcy proceedings depend on the covenants failing to survive the 2016

25

**B.** **Plaintiff Has Not Shown A Reasonable Likelihood Of Success On The Merits As To The Noncompete: It Is Unenforceable.**

Plaintiff seeks to enforce the Noncompete against both Defendants. This opinion gives the Restrictive Covenants, entered into when CIS Inc. was sold to Buyer 1, the additional latitude afforded in the context of a sale of a business.[129] The Noncompete has two temporal components. It lasts until the later of five years from the 2013 SPA and two years from termination of employment with Cleveland.[130] The five-year component expired in 2018, so Defendants do not challenge its reasonableness.

Starting with the two-year component: viewed in isolation, particularly for key employees in the context of a sale of a business, that period might be

---

SPA. *See* DOB at 38 (arguing the 2016 SPA provides clarity "as to why the 2013 SPA was not mentioned in the bankruptcy proceedings. The 2013 SPA was not assumed (or even mentioned) in the bankruptcy proceedings, because there were no remaining rights or obligations with regard to Byers or Frye following the 2016 SPA.").

[129] I am not convinced that latitude is warranted. Buyer 1 sold its interest in 2016. Buyer 2 agreed to a term under which the Noncompete would be cancelled, supporting the inference that Buyer 2 did not pay for that protection of CIS Inc.'s goodwill. As I have explained, the Noncompete was not cancelled after all, and it remained enforceable by CIS Inc. as a party to the 2013 SPA. It is not clear to me that the Noncompete should retain the sale-of-a-business buffer when enforced by the target after twelve years, the buyer's liquidation of its interest, and a failed promise to terminate it in that liquidation. But as I find the Noncompete is unenforceable even under the less searching sale-of-a-business inquiry, I do not hold that standard is not applicable here.

[130] 2013 SPA § 7.5(a).

reasonable.[131]   Here, a two-year Noncompete may very well serve Plaintiff's interests in protecting its goodwill and preventing Defendants from using the experience and relationships they developed at Cleveland in competition against it.

But when that two-year period is combined with a geographic scope prohibiting competition anywhere in North America, the Noncompete is facially broader than necessary to protect Plaintiff's U.S. business interests.[132]   While Plaintiff may have customers with operations or assets in Canada and Mexico, Plaintiff only services such customers within the U.S.[133]   Plaintiff's oil and gas pipeline inspection business is geographically rooted:  its employees must physically

---

[131] *Weichert Co. of Pa. v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007) (enforcing a two-year noncompete with a twenty-five mile radius contained in an office manager's employment agreement) (footnote omitted)); *Kan-Di-Ki*, 2015 WL 4503210, at *19 (holding two years was a reasonable duration for a noncompete covering twenty-three states executed in connection with the sale of a business); *Berryman*, 2004 WL 835886, at *10–11 (enforcing a two-year noncompete covering the company's operational footprint against the company's president because it protected a "legitimate interest in preventing [the president's] contacts, developed as an employee and officer of [the company], from being used in competition against it"); *COPI of Del., Inc. v. Kelly*, 1996 WL 633302, at *3, *5 (Del. Ch. Oct. 25, 1996) (enforcing two-year restrictive covenants with a twenty-five mile radius against company officer); *Singh v. Batta Env't Assocs., Inc.*, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003) (finding no issue with a two-year restrictive covenant's duration, but invalidating the provision because its 200-mile radius was unjustified).

[132] 2013 SPA § 7.5(a); POB Ex. 3 at Interrog. Resp. No. 15.

[133] POB Ex. 6 at 13–14, 17; *see* POB Ex. 3 at Interrog. Resp. Nos. 15, 18, 19, 24; POB 7–8, 45; Byers Dep. at 33, 36.

see a pipeline to inspect it.[134]  Plaintiff does not service its customers' pipelines outside of the U.S., so it has no interest in prohibiting others from doing so.  Plaintiff has not articulated how its U.S. business would be harmed if, for instance, Defendants worked for a pipeline inspection company that operated solely in Canada.[135]  It follows that Plaintiff has no legitimate business interest that would preclude Defendants from doing so for two years.

Plaintiff argues, based on reasoning in *Research & Trading Corp. v. Pfuhl*,[136] that it may protect its "goodwill where its customers are located."[137]  But *Pfuhl*'s reasoning relates to restrictions on soliciting those customers.  *Pfuhl* held that if an employer's customer base extends "internationally, and the employee would gain from the employment some advantage in any part of that market, then it is

---

[134] *See* Byers Dep. at 9 ("Q. And the business of Cleveland Integrity Services was to provide, among other things, inspectors and inspection services to the oil and gas industry at the site of construction of pipelines?  A. Yes."); Byers Dep. at 9 ("Q. And what was the role that the inspector would perform at that site of construction or repair or maintenance? A. Inspecting."); POB Ex. 11 at 20–21 ("Q. What you mean by inspector placement is that you would be deciding which inspectors would go to which job site?  A. Yes, ma'am.  Q. And that was part of managing the client relationship as well; correct?  A. Yes, ma'am."); POB Ex. 16 at 126 ("Q. Now, ma'am, your core product is sending out inspectors to pipeline sites to provide inspection services; correct?  A. Yes.").

[135] While certain Subsidiaries may provide services internationally, the Noncompete does not purport to protect those international business interests.  *See* POB Ex. 3 at Interrog. Resp. No. 15.  Unlike the Nonsolicit, the Noncompete makes no reference to affiliate entities other than Plaintiff's own subsidiaries, of which there are none.  2013 SPA §§ 7.5(a), 1.1; POB Ex. 3 at Interrog. Resp. No. 17.  Plaintiff does not argue the Subsidiaries' international presence supports the Noncompete's enforceability.  *See* POB at 44–48.

[136] 1992 WL 345465 (Del. Ch. Nov. 18, 1992).

[137] POB at 45.

28

appropriate that an employee subject to a non-competition agreement be prohibited from soliciting those customers on behalf of a competitor regardless of their geographic location."[138]  This reasoning does not support the Noncompete, which does more than prohibit Defendants from soliciting Plaintiff's non-U.S. customers: it prohibits them from engaging in pipeline inspection work at all, anywhere in North America.[139]

Plaintiff also cites *Kan-Di-Ki v. Suer* for the proposition that the restricted area does not need to "map perfectly onto the geographical area of the plaintiff's business" because it is the "employer's goodwill in a particular market that is entitled to protection."[140]  In *Kan-Di-Ki*, the noncompete covered "the twenty-three states west of the Mississippi River" even though the employer only operated in eight states at the time of contracting.[141]  The scope was still reasonable because "during the period of the Non–Competition Provisions' effectiveness, [the] business expanded to include" most of the remaining covered states.[142]  Plaintiff is correct that a noncompete's geographic scope need not perfectly match the employer's

---

[138] *Pfuhl*, 1992 WL 345465 at *12.

[139] 2013 SPA §§ 7.5(a), 1.1.

[140] POB at 45–46 (quoting *Kan-Di-Ki*, 2015 WL 4503210, at *20).

[141] *Kan-Di-Ki*, 2015 WL 4503210, at *19.

[142] *Id.* at *20.

footprint at the time of contracting, at least in the context of a sale of the business. But the employer must still have a legitimate business interest in the protected area.

Here, at the time of contracting in 2013, the Noncompete's North American scope may have been reasonable as a means to protect its interest in expanding its services beyond the U.S. free from Defendants' interference. But Plaintiff's business has not expanded beyond the U.S., and Plaintiff has offered no evidence that it plans to do so.[143] At the time of enforcement, in 2025, Plaintiff bears the burden of showing the covenant's scope advances a legitimate economic interest.[144] Time has shown that any 2013 interest in expansion has gone unfulfilled. The Noncompete is geographically overbroad.[145] Coupled with a two-year duration, it is unenforceable.[146]

---

[143] *Cf.* POB Ex. 6 at 20–21.

[144] *See Kan-Di-Ki*, 2015 WL 4503210, at *20, *20 n.236 (reasoning a noncompete's facially overbroad geographic scope at the time of contracting was initially reasonable to protect the employer's expansionary interest and reasonable at the time of enforcement because the employer demonstrated its business had expanded into most of the restricted area).

[145] *See Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236, at *2, *4 (Del. Ch. Mar. 16, 2023) (striking global noncompete where employer's business only served clients nationwide); *Hub Gp., Inc. v. Knoll*, 2024 WL 3453863, at *1 n.5, *8, *13 (striking noncompete with an "ill-defined" geographic scope that the employer acknowledged prohibited "any form of work for any competing business in North America"); *cf. Brace Indus. Contr., Inc. v. Peterson Enters., Inc.*, 2015 WL 5097240, at *3 (Del. Ch. Aug. 28, 2015) (enforcing restrictive covenant covering U.S. and Canada where employer "d[id] business worldwide").

[146] Neither Section 7.5(c)'s purported acknowledgment that the Restrictive Covenants are reasonable, nor its purported mandate to blue-pencil if part of either Restrictive Covenant

Given this conclusion, Plaintiff contends "blue penciling would be appropriate" because any overreaches are only "in the margins."[147] While this Court has, in some instances, used its discretion to blue pencil overly broad restrictive covenants, doing so creates confusion, encourages employers to overreach, and encourages litigation "by building a degree of uncertainty into every employment agreement."[148] To be sure, the geographic overreach from Plaintiff's United States interests could be worse. But the point remains that Plaintiff has no legitimate business interest in countries outside of the United States, much less one that could support a two-year noncompete: enforcing an overbroad noncompete carries systemic costs. I decline, in my discretion, to blue-pencil the parties' negotiated agreement.[149]

---

is held to be unenforceable, alters this conclusion. *Sunder Energy I*, 305 A.3d at 753; *Kodiak*, 2022 WL 5240507, at *4, *6; *see also Sunder Energy II*, 2024 WL 5052887, at *10.

[147] PRB at 34 n.7.

[148] *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 689–94 (2008); *see also C & J Energy Servs.*, 107 A.3d at 1054 ("To blue-pencil a contract . . . is not an appropriate exercise of equitable authority in a preliminary injunction order."); *Kodiak*, 2022 WL 5240507, at *4, *4 n.49.

[149] *Sunder Energy II*, 2024 WL 5052887, at *12 (upholding Court of Chancery's exercise of discretion not to blue pencil a restrictive covenant and noting the Vice Chancellor's reasoning that "the law should not create a 'no-lose' scenario in which employers receive the benefits of an overbroad covenant and, on those occasions when enforceability is challenged, gain the benefit of a lawful restriction through blue-penciling" (quoting *Sunder Energy I*, 305 A.3d at 754 n.68)).

## C. Plaintiff Has Shown A Reasonable Likelihood Of Success On The Merits As To The Nonsolicit.

Plaintiff seeks to enforce the Nonsolicit against Byers, but not Frye. For the reasons below, I conclude the Nonsolicit is enforceable and that Byers breached it.

### 1. The Nonsolicit Is Enforceable.

Plaintiff has demonstrated a reasonable probability of success on the merits as to the Nonsolicit. As explained, the Restrictive Covenants survived the 2016 SPA and bankruptcy APA, so the Nonsolicit is valid under contract law.

It is also enforceable under the law governing restrictive covenants. The Nonsolicit does not have a geographic scope, as it is tied to business relationships rather than locations.[150] Byers does not challenge the Nonsolicit's undefined geographic scope. He argues more generally that "the geographic scope of the non-compete restriction renders the post-employment restrictive covenants unenforceable."[151] While courts may consider the interaction between multiple restrictive covenants to assess reasonableness,[152] nothing about the Noncompete's geographic scope bears on the Nonsolicit's reasonableness.

The Nonsolicit advances legitimate business interests as it applies to Plaintiff. It lasts for two years. Like the Noncompete, the Nonsolicit's two-year duration does

---

[150] *See* 2013 SPA § 7.5(b).

[151] DOB at 32–33.

[152] *E.g.*, *Sunder Energy I*, 305 A.3d at 753.

not itself make the covenant unreasonable.[153]  The Nonsolicit has three components: (1) Byers may not attempt to solicit Plaintiff's employees for hire or encourage them to leave their employment; (2) Byers may not solicit customers or other "business relations"[154] like suppliers to cease or materially reduce their business with Plaintiff; and (3) Byers may not interfere with the relationship between customers or other business relations, on the one hand, and Plaintiff, on the other.  All three components protect Plaintiff's interest in preventing Byers from capitalizing on the relationships he developed at Cleveland and Parent—with Plaintiff's employees, customers, suppliers, and other business relations—to Plaintiff's detriment.

Byers played an integral role in Cleveland's customer relations.  He attended events and dinners to attract and maintain customers.[155]  He mentored other Cleveland employees on how to deal with customers.[156]  And when he was demoted from his executive position, Parent placed him in a customer-facing role to leverage his reputation and client relationships.[157]  Indeed, Byers & Partners bears Byers's

---

[153] Like the Noncompete, the Nonsolicit has an expired five-year component that is not at issue.

[154] The Nonsolicit lists the following examples of business relations:  customers, partners, joint venturers, referral sources, payors, suppliers, vendors, licensees, licensors, developers, and consultants.  2013 SPA § 7.5(b).

[155] POB Ex. 11 at 29–30; POB Ex. 16 at 93–94.

[156] *See* POB Ex. 11 at 28–29.

[157] POB Ex. 6 at 67, 71.

name because of his industry reputation.[158]  Using that reputation, Byers has already solicited Plaintiff employees,[159] Plaintiff customers,[160] and investors connected to current Plaintiff customers.[161]

The Nonsolicit applies not just to Plaintiff, but also to Parent's Subsidiaries.[162] This also advances Plaintiff's legitimate business interests.  While including affiliates expands the Nonsolicit's scope, that broader scope is justified here by a broader economic interest.  Parent collected subsidiaries in related industries under one corporate umbrella to create synergies by enabling cross-selling and information sharing.[163]  Plaintiff benefits from that insofar as it can successfully cross-sell to customers of the Subsidiaries.  By the same token, Plaintiff is harmed when an affiliate customer reduces its business with that affiliate:  if the customer has a weaker relationship with the affiliate, cross-selling to that customer is more difficult. If the customer ceases doing business with the affiliate, cross-selling to that customer becomes impossible.[164]

---

[158] POB Ex. 11 at 54–58, 70–72; POB Ex. 18.

[159] Byers Dep. at 23, 61–62; Frye Dep. at 25; POB Ex. 11 at 38–41; Byers Dep. at 23.

[160] POB Ex. 11 at 84–90, 122.

[161] *See* Byers Dep. at 68–72.

[162] 2013 SPA § 7.5(b).

[163] Byers Dep. at 38–39, 91; Ex. 6 at 105–06.

[164] This logic extends to customers that Subsidiaries service in Mexico and Panama, as Plaintiff has demonstrated its ability to sell its U.S.-based services to customers with

Plaintiff has also shown it is harmed when a Subsidiary employee leaves for a competitor. For Plaintiff, employee stability nurtures better collaboration among Subsidiaries, increasing cross-selling potential.[165] Employee stability also promotes deeper customer relationships, again improving cross-selling potential.[166] The same logic applies to maintaining stable relationships with suppliers and other business relations that can support a web of cross-selling customer relationships. While Plaintiff does not have an interest in preventing Byers from engaging with such parties altogether, it does have an interest in preventing Byers from interfering in its relationships with such parties.

Plaintiff has demonstrated it is likely to prove by a preponderance of the evidence that Byers had access to the Subsidiaries' confidential information, providing a potential advantage in soliciting employees, customers, and other business relations.[167] As Parent's CEO, he had access to the Subsidiaries' financials, pricing information, customer lists, and a proprietary database containing various

---

operations and headquarters outside the U.S. POB Ex. 6 at 13–14, 17, 21; POB Ex. 7; POB Ex. 3 at Interrog. Resp. No. 15. Byers does not argue the international reach of certain Subsidiaries affects the Nonsolicit's enforceability. *See* DOB 33–35.

[165] *See* POB Ex. 6 at 82 (testifying that Subsidiary employees attend an annual business summit to review business development strategies and information, including "who the key points of contact within each of the organizations are for the purposes of cross-selling").

[166] *See* Byers Dep. at 39.

[167] POB Ex. 6 at 37; *see* POB Ex. 11 at 182; *see Ainslie*, 2023 WL 106924, at *18; *Kodiak*, 2022 WL 5240507, at *11; *Fortiline*, 2024 WL 4088629, at *4–5.

employee information, including details about employee performance and clients served.[168] After Byers was demoted, he was responsible for business development for Parent, i.e., across Subsidiaries.[169] In both his executive and business development roles, he had access to the Subsidiaries' confidential information via Salesforce, and he was trained to properly use the platform in his business development capacity.[170] He also retained confidential information relating to Parent's business in hard copy form after his demotion.[171]

Plaintiff has also shown it will likely prove its interest in protecting Parent's business model against Byers's interference at the time of the 2013 SPA, even though Parent had only acquired two of the four Subsidiaries and had yet to change its name to reflect the company's broader range of services. Byers testified that before he became Parent's CEO in 2015, the organization was not where company

---

[168] POB Ex. 6 at 31–36.

[169] *See* DOB Ex. 20.

[170] POB Ex. 6 at 37; DOB Ex. 20; POB Ex. 6 at 75–79.

Byers contends he was not privy to the Subsidiaries' confidential information because he did not regularly use the Salesforce platform. DOB at 33–35; POB Ex. 6 at 37. But Byers's job as Parent's CEO was to work with Subsidiary employees to develop customer relationships and improve cross-selling; he apparently did so without documenting his work on Salesforce (to Parent's chagrin). POB Ex. 6 at 37; Byers Dep. at 91. And Salesforce was only one of Byers's access points to the Subsidiaries' confidential information. POB Ex. 6 at 31–36. On this record, Plaintiff has established it will prove Byers likely had access to such information.

[171] *See* POB Ex. 6 at 33–34.

leaders had hoped to be in terms of cross-selling.[172]  Cross-selling "was *always* the hope and the plan, but the follow-through wasn't so good" before he took charge.[173] Plaintiff has demonstrated the Nonsolicit advances a legitimate business interest, not only in its application to Plaintiff's business, but in its application to the Subsidiaries, both at present and when entered into.

Byers makes several counterarguments in response.  First, he argues the restriction is overbroad because it "prohibits various activities" not only with respect to customers, but also to any "partner, joint venturer, referral source, payor, supplier, vendor, licensee, licensor, developer, consultant or other business relation."  But the provision is narrower than Byers implies.  Unlike its restriction with respect to employees, the Nonsolicit does not provide for a blanket ban on soliciting business relations.  Byers may still engage with Plaintiff's customers, suppliers, and other business relations as long as he does not interfere with Plaintiff's relationships with such parties.  Rather than overbroad, the Nonsolicit appears tailored to protect Plaintiff's legitimate interests as it applies to Plaintiff's business.

Next, he contends Plaintiff has offered only "lip service" justifying the Nonsolicit's extension to the Subsidiaries that does not evince a sufficiently strong

---

[172] Byers Dep. at 91.

[173] *Id.* (emphasis added).

interest.[174] In *Centurion Service Group, LLC v. Wilensky*, this Court concluded that general statements as to the subject employee's exposure to confidential information, "deals," and "relationships" did not show the "particularly strong economic interest" necessary to support a broad and vague geographic area and scope of conduct.[175] Here, Plaintiff has provided evidence of Byers's access to customer information, demonstrated his significance to Cleveland's and Parent's customer relationships, shown how and why the Subsidiaries share customer information for the benefit of each Subsidiary and Parent, and explained why Plaintiff has a legitimate business interest in protecting its customers and the Subsidiaries' customers from Byers's solicitation.

Byers next argues the Nonsolicit is overbroad because it prohibits Byers from soliciting Subsidiary customers "to cease doing or materially reduce [their] business, regardless of whether Byers ever had any contact with such persons or even knows who they are."[176] Byers is correct that restrictive covenants including affiliates risk being overbroad.[177] Recent cases—in particular *Fortiline, Inc. v. McCall*,[178] *Hub*

---

[174] DOB at 34–35 (citing *Centurion Serv. Gp., LLC v. Wilensky*, 2023 WL 5624156, at *4–5 (Del. Ch. Aug. 31, 2023)).

[175] *Wilensky*, 2023 WL 5624156, at *4–5.

[176] DOB at 35 (citing *Kodiak*, 2022 WL 5240507, at *12).

[177] *Eagle Infrastructure Super Holdco, LLC v. Harmon*, 2024 WL 5103919, at *3 (Del. Ch. Dec. 12, 2024).

[178] 2024 WL 4088629.

*Group, Inc. v. Knoll*,[179] *Eagle Infrastructure Super Holdco, LLC v. Harmon*,[180] *Kodiak Building Partners, LLC v. Adams*,[181] and *Ainslie v. Cantor Fitzgerald, L.P.*[182]—invalidated restrictive covenants as overbroad in part because they applied to entities that were affiliated only by their status as portfolio companies of the same parent company: they did not actually collaborate or work together, so the business success of one did not affect the business success of another.[183] And the employees at issue did not have access to the confidential information of the affiliates.[184] As *Fortiline* put it:

---

[179] 2024 WL 3453863.

[180] 2024 WL 5103919.

[181] 2022 WL 5240507.

[182] 2023 WL 106924.

[183] *Fortiline*, 2024 WL 4088629, at *2, *5 (involving "many, many, many [a]ffiliates," often "in completely different business sectors"); *Harmon*, 2024 WL 5103919, at *2 (addressing restrictive covenants that applied to "an untold number of" affiliate entities under a business development company's broad portfolio of subsidiaries); *Hub Gp.*, 2024 WL 3453863, at *11–13 (addressing restrictions on "working for an entity that competes with any of [the employer's] 25 entities, located in at least four countries" if the employee "could disclose or use Confidential Information"); *Ainslie*, 2023 WL 106924, at *1, *18, *18 n.151 (noting the partnership did "not point[] to any legitimate business interest that could be served by protecting all its unspecified affiliates"); *Kodiak*, 2022 WL 5240507, at *2, *10–11 (addressing affiliates engaged in several lines of business outside of the employer's business of truss manufacturing).

[184] *Fortiline*, 2024 WL 4088629, at *5 (noting the employer failed to show any "legitimate business interest in protecting those other sectors from [the employees'] work" and the employees "did not obtain confidential information about any" of the affiliates); *Hub Gp.*, 2024 WL 3453863, at *11 (striking a restriction that prohibited disclosure or use of "Confidential Information" that was "not limited to information that [the employee] had access to or utilized in his position as Senior Vice President of Account Management with [the employer]; it includes nonpublic information related to all 25" affiliates); *Ainslie*, 2023

> Where a plaintiff fails to show any legitimate business interest served by shielding all its unspecified affiliates from the restrained party's competition, and fails to show the restrained party had access to any kind of information that would warrant that restriction, the plaintiff has failed to justify the restrictive covenant as drafted.[185]

*Ainslie*'s nonsolicitation provision was also vague, presenting a real risk of an employee unknowingly breaching the covenant.[186]

The Nonsolicit here does not present the same problems. There are a limited number of known affiliates.[187] The Subsidiaries cross-sell. Byers had access to their confidential information and was responsible for their business development.[188] The Nonsolicit is considerably narrower than the covenants in *Hub Group* and *Ainslie*.[189] And while complying with the provision may require Byers to identify whether a customer or employee is a Subsidiary customer or employee, that is not an

---

WL 106924, at *18 (noting there was "no indication that [the employees ] had access to any kind of information—proprietary or otherwise—that would warrant" the restrictive covenants' application to affiliate entities); *Kodiak*, 2022 WL 5240507, at *11 (noting the employee was not involved with non-truss affiliates and did not have access to their confidential information).

[185] *Fortiline*, 2024 WL 4088629, at *4.

[186] *Ainslie*, 2023 WL 106924, at *18.

[187] *See Fortiline*, 2024 WL 4088629, at *2, *5; *Harmon*, 2024 WL 5103919, at *2; *Hub Gp.*, 2024 WL 3453863, at *11–13; *Ainslie*, 2023 WL 106924, at *1, *18, *18 n.151; *Kodiak*, 2022 WL 5240507, at *2, *10–11.

[188] Byers Dep. at 41.

[189] 2024 WL 3453863, at *11–13; 2023 WL 106924, at *18.

unreasonable compliance issue like the one in *Ainslie*.[190] It is enforceable against Byers.

Byers next argues the Nonsolicit is unenforceable because Cleveland breached his employment agreement when it demoted him to the business development role at Parent.[191] Indeed, Byers's employment agreement named him as Cleveland's president and CEO.[192] But Byers does not explain why that demotion excuses his obligations under the Nonsolicit in the 2013 SPA, which is not tied to his employment as an executive, but rather to his employment at Cleveland.[193] Byers remained on Cleveland's payroll.[194] His demotion to a business development role in 2023 does not affect the enforceability of the Nonsolicit.

---

[190] 2023 WL 106924, at *18.

[191] DOB at 38–40.

[192] *See* POB Ex. 9.

[193] 2013 SPA § 7.5(a)–(b).

Byers cites to *Kass v. Brown Boveri Corp.*, a 1985 case from the Superior Court of New Jersey, which notes "an emerging pattern of . . . case law supporting the propositions that [the employer]'s attempt to reclassify [the employee] to a lesser job status constructively discharged him in violation of his employment contract." 488 A.2d 242, 245 (N.J. Super. Ct. App. Div. 1985). But Byers has not argued he was constructively discharged. Byers also cites *Physiotherapy Corp. v. Moncure*, which concluded the employer's "prior material breach of the Employment Agreement excuse[d] [the employee]'s obligations under the Non-Compete." 2018 WL 1256492, at *1–2 (Del. Ch. Mar. 12, 2018). But there, the employer's conduct substantially reduced the employee's compensation. *Id.* at *5. Byers has offered no evidence his compensation was reduced, arguing only that his role was reduced. DOB at 38–40; DRB at 7, 18; *see also* POB Ex. 6 at 77; Byers Dep. at 44.

[194] Byers Dep. at 43–44 ("Q. Okay. But you remained on the payroll of Cleveland all the way through February of 2024; is that correct? A. Correct.").

Finally, Byers argues that even if he is bound by the terms of the Nonsolicit, the two-year restricted period has expired.[195]  Byers contends a declaration in the bankruptcy case from CIS Inc.'s CEO, which omitted him from a chart of Cleveland employees and referred to him as a Parent employee, demonstrates that Byers's Cleveland employment had terminated by 2021.[196]  Byers thus argues his restricted period under the Nonsolicit expired by 2023, so he is no longer bound by the covenant.[197]  But the preponderance of the evidence indicates Byers's employment at Cleveland was not terminated when he was promoted to Parent chairman and CEO.  Byers did not provide any notice of termination of his employment agreement, he remained on Cleveland's payroll through his 2024 resignation, and he continued to receive health insurance benefits through Cleveland.[198]  The Nonsolicit is enforceable against Byers.

### 2.    Byers Breached The Nonsolicit.

Byers breached the Nonsolicit by soliciting Frye, Harmon, and Travis to join Byers & Partners.[199]  Plaintiff has also shown Byers likely interfered with its relationship with Southern Star in breach of the Nonsolicit by meeting with Southern

---

[195] DOB at 40–41.

[196] *Id.*

[197] *Id.*

[198] Byers Dep. at 37, 43, 46.

[199] *Id.* at 23, 61–62; Frye Dep. at 25; POB Ex. 11 at 38–41.

Star to discuss shifting some of its service to Byers & Partners.[200] Southern Star

now has a master service agreement with Byers & Partners.[201]

### D.    Irreparable Harm

Delaware law recognizes that a breached restrictive covenant causes

irreparable harm.[202] Measuring the effects of such breaches "involves a costly

---

[200] POB Ex. 11 at 84–90.

The meeting with Duke Piedmont also may have breached the Nonsolicit. But the evidence of that meeting's content is limited to Harmon's testimony that he, Byers, and Travis set up the meeting "to talk to [Duke] Piedmont about doing business with [Byers & Partners]." *Id.* at 119. I cannot conclude that the meeting was an attempt to solicit Duke Piedmont to cease or materially reduce its business with Plaintiff. Nor can I conclude at this stage that the meeting interfered with Plaintiff's relationship with Duke Piedmont.

Harmon's work soliciting customers did not breach Byers's Nonsolicit because Plaintiff has not shown Byers was acting indirectly through Harmon. Harmon reported to Cheryl as the head of Byers & Partners, not Byers. POB Ex. 11 at 62–63. And while Cheryl is Byers's "Affiliate" under the 2013 SPA, Plaintiff has not shown Byers was indirectly running the company through Cheryl such that the conduct of all Byers & Partners employees might be indirectly attributed to Byers for purposes of establishing a breach of the Nonsolicit. *See* 2013 SPA § 1.1.

Finally, soliciting investments in Our Gang did not violate the Nonsolicit in this case. 2013 SPA § 7.5(b). Plaintiff argues Byers solicited investments from Plaintiff's current employees and individuals with connections to Plaintiff's customers. POB at 25–26. The Nonsolicit prohibits soliciting Plaintiff's employees for hire, soliciting Plaintiff's business relations to cease or materially reduce their business with Plaintiff, and interfering with Plaintiff's relationships with its business relations. 2013 SPA § 7.5(b). By its plain text, the provision does not prohibit soliciting investments from employees. As to the individuals with connections to Plaintiff's customers, Plaintiff has not argued or shown how soliciting their investment might interfere with their relationships with Plaintiff. Plaintiff offers no alternative argument that soliciting these individuals breaches the Nonsolicit.

[201] POB Ex. 11 at 122.

[202] *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2008 WL 902406, at *10 (Del. Ch. Apr. 3, 2008); *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019

---

process of educated guesswork with no real pretense of accuracy."[203]  Here, Byers

& Partners operates in the same industry as Plaintiff.  Byers was integral to customer

relations at Cleveland, then Parent, and now Byers & Partners.  His improper use of

those relationships to draw employees and customers from Plaintiff to his own

competing company would cause Plaintiff irreparable harm.

## E.    Balance Of The Equities

Byers received more than $12 million in the 2013 SPA when he agreed to the

Nonsolicit.[204]  He was a sophisticated seller represented by counsel.[205]  The fact that

he agreed to the Nonsolicit twelve years ago does not make it inequitable to enforce.

Byers agreed to contractual language that started the clock on the two-year

component of the Nonsolicit when his employment at Plaintiff ended, regardless of

how long after the 2013 SPA that occurred.  There is no inequity in holding Byers

to the bargain he struck.  This is particularly so when this decision allows Byers to

work in his chosen field, and prohibits him only from unfair competition via

solicitations from Plaintiff that interfere with Plaintiff's employee base and customer

relationships.

---

WL 2536104, at *20 (Del. Ch. June 20, 2019); *U.S. Legal Support, Inc. v. Lucido*, 2021 WL 4940823, at *11 (Del. Ch. Oct. 22, 2021).

[203] *Alliant Ins. Servs.*, 2019 WL 2536104, at *20 (Del. Ch. June 20, 2019) (quoting *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *18 (Del. Ch. Jan. 17, 2007)).

[204] Byers Dep. at 23.

[205] *Id.* at 25; POB Ex. 6 at 18–19.

## F.    Scope Of The Preliminary Injunction

Plaintiff has "ask[ed] the Court to find that Byers, Frye, and their spouses must divest their interest in Our Gang, and that Cheryl Byers, who has been acting in concert with Byers & Partners, must also be enjoined from owning, operating, or having any involvement in Our Gang and Byers & Partners."[206]  Investing in Our Gang might be prohibited under the Noncompete's restriction on investing in a competitive business.[207]  And Cheryl's involvement in Our Gang and Byers & Partners might be prohibited under the Noncompete as Byers's indirect involvement in a competitive business.[208]  But because the Noncompete is unenforceable, Defendants will not be ordered to comply with it.  And that conduct, standing alone, is not barred by the Nonsolicit, as it does not solicit Plaintiff's employees for hire, solicit Plaintiff's business relations to cease or materially reduce their business with Plaintiff, or interfere with Plaintiff's relationships with its business relations.[209]

Byers shall comply with the Nonsolicit.  He may not, directly or indirectly, solicit or attempt to solicit employees of Plaintiff or any Subsidiary; solicit or attempt to solicit any customer, partner, joint venturer, referral source, payor, supplier, vendor, licensee, licensor, developer, consultant or other business relation

---

[206] DOB at 36–37; D.I. 26; C.A. No. 2024-0372 D.I. 53.

[207] *See* 2013 SPA § 7.5(a).

[208] *See id.*

[209] Plaintiff does not explain how it could.  *See* POB at 55–56.

45

of Plaintiff or any Subsidiary to cease or materially reduce its business with Plaintiff or any Subsidiary; interfere with the relationship between any such third party, on the one hand, and Plaintiff or any Subsidiary, on the other hand; or take any other action that would violate the Nonsolicit.[210] For the avoidance of doubt, Byers may not provide any information or support in furtherance of any such solicitation to Frye, Travis, Harmon, or any other Byers & Partners employee: that would be indirect solicitation.

So long as Byers complies with the Nonsolicit, he may attend industry events and promote the company by wearing Byers & Partners swag: Plaintiff's request that he be enjoined from doing so is denied. Plaintiff has not demonstrated such conduct necessarily interferes with its business relationships or constitutes an attempt to solicit its customers or other business relations to cease or materially reduce their business with Plaintiff.[211]

## III.    CONCLUSION

Plaintiff is entitled to a preliminary injunction enforcing the Nonsolicit against Byers. Plaintiff and Byers should submit a proposed form of order implementing the rulings contained herein. In addition, within ten days of the date of this opinion,

---

[210] As explained, the conduct of Byers & Partners employees does not constitute indirect conduct by Byers merely because the employee works at Byers & Partners.

[211] Plaintiff's briefs make no attempt to justify this relief under the Nonsolicit.

counsel for Byers shall submit an affidavit indicating the reasonable amount of a bond. To the extent Plaintiff objects to any aspect of that affidavit or the amount of the bond, Plaintiff shall state all such objections in a written filing within ten days after the date Byers files his affidavit. Byers may file a brief reply within five days thereafter.